**LITTLE COMPANY OF MARY HOSPITAL AND HEALTH CARE CENTERS, Plaintiff,**

v.

**Donna SHALALA, Secretary of the U.S. Department of Health and Human Services, Defendant.**

**No. 97 C 4107.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 18, 1998.

Kurt Hudson of Hinshaw & Culbertson, Chicago, IL, for Plaintiff.

Kathryn Kelly, Asst. U.S. Atty., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Little Company of Mary Hospital and Health Care Centers ("Hospital") brings this action pursuant to 42 U.S.C. § 1395oo(f)[1] to contest the decision by Secretary of Health and Human Services Donna Shalala ("Secretary")[2] to deny certain amounts of Medicare reimbursement claimed by Hospital for the fiscal year ended June 30, 1988 under Title XVIII of the Social Security Act (colloquially "Medicare," Sections 1395–1395ccc). Hospital contends alternatively (1) that Secretary's denial was arbitrary and capricious or (2) that her determination violated Hospital's due process rights under the Fifth and Fourteenth Amendments.[3]

Hospital and Secretary have filed cross-motions for summary judgment under Fed. R.Civ.P. ("Rule") 56. Both parties have complied (at least in part) with this District Court's General Rule ("GR") 12(M) and 12(N), which have been adopted to facilitate the resolution of Rule 56 motions by smoking out any disputed issues of material fact.[4] With the cross-motions now fully briefed, the issues are ready for decision.

For the reasons stated in this memorandum opinion and order, this Court holds that Secretary did not arbitrarily and capriciously deny Hospital's claim for Medicare reimbursements, nor was her decision violative of due process. Accordingly Secretary's motion is granted while Hospital's is denied, and this action is dismissed.

### Summary Judgment Standards

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)). Where as here cross-motions for summary judgment are involved, it is necessary to adopt a dual perspective—one that this Court has often described as Janus-like—that sometimes forces the denial of both motions. That potential for such a dual denial does not arise here, however, because the underlying facts are not in dispute. Instead the parties are at odds about whether as a matter of law Secretary complied with the statutes and regulations governing the Medicare program.

### Standard and Scope of Review[5]

Judicial review of Secretary's Medicare reimbursement decisions is limited as to

---

1. All further citations to Title 42 provisions will take the form "Section—," reflecting their Title 42 section numbers rather than the Medicare statute's internal numbering.

2. Initially Nancy–Ann Min DeParle ("DeParle"), Administrator of the Health Care Financing Administration ("HCFA"), was also listed as a defendant in her official capacity. On November 5, 1997 this Court orally granted Secretary's motion to dismiss DeParle from the case, noting that Secretary is the only proper party defendant in such an action.

3. Just how the Fourteenth Amendment, which imposes constraints only on the States, can be implicated in an action against the federal government is a mystery that will never form the subject matter of an episode of *Law and Order* or *The Practice.*

4. Although Hospital filed a GR 12(M) statement of material facts, Secretary did not file a comparable GR 12(M) statement in support of her own motion. But Secretary has responded to Hospital with a GR 12(N)(3)(A) statement, so that this Court does have each side's version of the rele-

vant facts. And where as here the court's review is limited to a previously established administrative record, rather than evidence drawn from varied sources and proffered in conjunction with the Rule 56 motion, there is no particular need for GR 12(M) and 12(N) to be brought into play (so that our District Court typically does not require adherence to those GRs in the most frequently encountered situations of that type—Social Security disability reviews). That is equally true in this case. All of this opinion's references to the administrative record will take the form "R.—."

5. After this Court had completed the final editing of this opinion to permit the making of last-minute changes followed by the opinion's issuance, it received—as part of the current batch of slip opinions from our Court of Appeals—one dealing with another aspect of Medicare reimbursement, but containing some discussions of issues covered here. Rather than attempting a partial rewrite to incorporate those discussions, this opinion will include footnote references to that newly-issued opinion where appropriate. Thus *Board of Trustees of Knox County Hosp. v. Shalala,* 135 F.3d 493, 499 (7th Cir.1998) contains a section on the review of Secretary's deci-

both standards and subject matter. As to the former, because Section 1395oo(f)(1) incorporates the Administrative Procedure Act ("APA") as the applicable standard, this Court may "hold unlawful and set aside" Secretary's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)). And as to the latter, *Smith v. Office of Civilian Health & Med. Program of the Uniformed Servs.*, 97 F.3d 950, 955 (7th Cir.1996) (citing numerous cases) reconfirms:

> In making this determination, the court reviews the administrative record as it stood when the agency acted, not extra-record material produced later in court.

■ In applying the general mandate of the APA to the Medicare reimbursement context, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)(internal citations and quotation marks omitted) has clarified the reviewing court's limited role:

> We must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. This broad deference is all the more warranted

when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.[6]

Thus this opinion's sole task is to pass on the reasonableness of Secretary's decision. It need not—and it specifically does not—rule on the correctness of that determination as such.

### Statutory and Regulatory Framework [7]

Medicare provides a federally funded health insurance program for the elderly and disabled. Only Medicare Part A, which authorizes payment for covered care in institutions such as Hospital, is at issue here. Secretary reimburses a qualified health care "provider of services" (Section 1395x(u)) for the reasonable cost of providing covered services to eligible Medicare beneficiaries through a "fiscal intermediary" (Sections 1395g and h). Each provider seeking reimbursement submits an annual cost report to the intermediary (42 C.F.R. §§ 413.20(a)–(b) and 413.24(f)) [8], which then audits the report, determines the amount of reimbursement due to the provider and issues a Notice of Program Reimbursement ("NPR" [9]) for the relevant fiscal year (Reg. § 405.1803).

Before 1982 Medicare reimbursed providers through a retrospective reasonable cost system. Under that method providers were paid the lesser of two figures—the "reasonable cost of" or the "customary charges with respect to" furnishing services to Medicare

---

sions that parallels what follows in the text of this opinion.

**6.** [Footnote by this Court] Despite that narrow scope of review, this Court is of course required within its boundaries to conduct a "thorough, probing, in-depth review" (*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). It is not "limited to rubber stamping agency action" (*Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1314 (2d Cir.1991)).

**7.** *Knox County Hosp.*, 135 F.3d at 495 also contains an extended explanation that matches, and

in some respects elaborates on, what follows in this section of this opinion.

**8.** All further citations to 42 C.F.R. will simply take the form "Reg. § —."

**9.** This Court, which has always tended to be allergic to the alphabet-soup proclivity that seems to be endemic to the federal government and its agencies, therefore normally tries to avoid the use of most such acronyms in favor of using intelligible English-language words for shorthand reference. As the text reflects, that has proved to be impossible here—but it can only be hoped that the number of alphabetical abbreviations does not create difficulties in following the discussion in this opinion.

beneficiaries—as determined in accordance with regulations promulgated by Secretary (Section 1395f(b)(1)).

That approach soon proved prohibitively expensive because it did not provide hospitals with sufficient incentives to render cost-efficient services. So as part of the Social Security Amendments of 1983, Congress dramatically restructured provider reimbursement by enacting the Prospective Payment System ("PPS," see Section 1395ww(d)). PPS established a number of Diagnostically Related Groups ("DRGs") that describe particular classes of patients and treatments and determine the rates that Medicare will pay for each one in the future. For that purpose the DRG cost schedules base reimbursement on national and regional average costs for the treatment of particular illnesses, regardless of an individual hospital's actual treatment costs (Section 1395ww(d)(2)(D); Reg. § 412.60). To deal with costs not adequately captured by DRG, the Medicare statute and its regulations contain a number of adjustment provisions to supplement the DRG-related reimbursement amounts, such as the indirect medical education ("IME") and graduate medical education ("GME") adjustments.

Following the issuance of a NPR, a dissatisfied provider may appeal the intermediary's determination to the Provider Reimbursement Review Board ("Board") if the amount in controversy is at least $10,000 and if the hearing request is submitted within 180 days of the initial NPR (Section 1395oo(a)). If those jurisdictional prerequisites are met, Board has the power to affirm, modify or reverse the intermediary's decisions (Section 1395oo(d)). Secretary, acting through the HCFA Administrator, may review the matter further either on her own motion or at the provider's request (Reg. § 405.1875). Any provider that remains dissatisfied with Board's or Secretary's final decision may then seek judicial review in the District Courts (Section 1395oo(f)(1)).

### Procedural History

Hospital, a non-profit hospital located in Evergreen Park, Illinois, maintains a nine-bed neonatal intensive care unit ("NICU") in addition to its nursery devoted to healthy newborn infants. Hospital's 1988 cost report submitted to its fiscal intermediary Blue Cross and Blue Shield of Illinois ("Blue Cross") excluded its NICU beds from the IME and GME calculations. Blue Cross disagreed and issued an NPR that included those beds in both figures, thus reducing Hospital's Medicare reimbursement.

Pursuant to Section 1395oo(f), Hospital appealed that adverse NPR to Board. On February 4, 1997 Board reversed, stating that Blue Cross had improperly included the provider's neonatal beds in the adjustment calculations and that Board had jurisdiction to review another reimbursement claim concerning loss on the sale of land. On April 4, 1997 Secretary reversed Board's decision and reinstated Blue Cross' ruling. Hospital has timely brought suit in this District Court to challenge that final administrative decision.

### Arbitrary-and-Capricious Claims
### IME Adjustment

Section 1395ww(d)(5)(B) provides that teaching hospitals that operate approved graduate medical education programs and that are subject to PPS shall receive an additional payment to reflect the higher indirect costs associated with such programs. To implement that statutory provision, in 1987 Secretary promulgated Reg. § 412.118 (now recodified at Reg § 412.105, though this opinion will continue to follow the 412.118 numbering applicable to the 1988 fiscal year at issue here) to calculate the IME adjustment. That calculation is made by multiplying a provider's DRG revenue by an IME adjustment factor, which is based partly on the ratio of a hospital's full-time interns and residents to the number of hospital inpatient beds (Section 1395ww(d)(5)(B)(ii)), the latter determined in accordance with Reg. § 412.118(b). Because an exclusion of beds reduces the denominator and thus increases the ratio, it is to the provider's reimbursement advantage to exclude as many beds as possible from the bed count.

 Hospital contends that Secretary's decision to include its NICU beds in the IME adjustment factor is incompatible with the controlling regulation's plain language. Because Secretary's interpretation of any of her regulations is entitled to substantial def-

erence, this Court is not free simply to decide whether it agrees with her decision. Instead the dispositive question is whether Secretary's reading is a reasonable construction of the controlling regulatory language.

At the time Hospital submitted its cost report for the fiscal year ending June 30, 1988, Reg. § 412.118(b) prescribed the formula for determining the number of beds in a hospital for purposes of the IME adjustment:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds assigned to newborns, custodial care, and excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

After the regulation was renumbered to 412.105(b) without substantive effect in 1991, it was then amended in September 1994 and again reworded in September 1995 to eliminate disputes such as the present one:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

Today's dispute centers around the meaning of the phrase "not including beds assigned to newborns" in the earlier version of the regulation.

Hospital contends that a straightforward reading of that bed-counting regulation plainly excludes *all* beds assigned to newborns, thus including those in its neonatal intensive care unit. That contention presupposes that the quoted language is clear and not susceptible to different interpretations. This Court disagrees with that position, as have two Courts of Appeals that have addressed the

question in unpublished orders (*Hahnemann Univ. Hosp. v. Shalala*, No. 96–5191, 1997 WL 362672, at *1 (C.A.D.C. May 5)(per curiam); *Sioux Valley Hosp. v. Shalala*, 1994 WL 377024, at *3 (8th Cir.1994), reported in table at 29 F.3d 628).[10] Ambiguity certainly permeates the regulatory phrase "not including beds assigned to newborns," for the regulation defines neither "beds" nor "newborns."

Secretary takes the position that Hospital's NICU beds were properly included in the bed count because the quoted regulatory phrase excludes only beds assigned to infants in the healthy newborn nursery. She argues that such a reading is called for by both the regulation's plain language and the long-standing bed-counting policy that existed at the time of Reg. § 412.118(b)'s promulgation. On that latter point Secretary directs this court's attention to various provisions of the Medicare Provider Reimbursement Manual ("PRM").

■ PRM contains interpretive rules promulgated to inform providers how Secretary will apply the Medicare statutes and regulations. As Justice O'Connor's dissent in *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 111, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) has observed:

> The PRM, of course, remains an important part of the Medicare reimbursement process, explaining in detail what the regulations lay out in general and providing those who must prepare and process claims with the agency's statements of policy concerning how those regulations should be applied in particular contexts.[11]

Black-letter law directs that such interpretive rules are entitled to deference as long as they do not alter the substantive obligations created by the Medicare statute and its regulations.

As Secretary properly notes, a general methodology for determining available beds

---

10. Secretary also cites to three other District Court decisions that have reached the same conclusion. Even though decisions by such courts (or by this Court) do not have precedential value, Hospital offers up nothing in the way of judicial support to counter the unbroken roster of adverse decisions at both the trial and appellate levels.

11. [Footnote by this Court] This quotation from a dissenting opinion should not be misunderstood. Indeed, the Court's majority opinion in *Guernsey Mem'l Hosp.* applied the selfsame approach that is followed here, *upholding* Secretary's regulations and her reading of the applicable provisions as embodied in a PRM.

dates back to at least 1975. PRM 2510.5, issued nearly a decade before adoption of the current Prospective Payment System and still in effect at the time relevant to this case, provides:

> For purposes of this section, a bed (either acute care or long-term care) is defined as an adult or pediatric bed (exclusive of a newborn bed) maintained for lodging inpatients, including beds in intensive care units, coronary care units, and other special care inpatient hospital units.

That definition, which excludes "newborn beds" but expressly includes "beds in intensive care units," may not itself be a model of crystal clarity, but Secretary can reasonably view it as lending support to her construction of the regulation at issue here. That construction is further buttressed by PRM 2202.7.II.A (1980, also still in effect at the relevant time in this case), which sets forth the conditions for qualifying as an intensive care type unit. Of particular significance here is the "Note" following that interpretive rule:

> NOTE: If a neonatal unit qualifies as an intensive care type unit, the days are considered intensive care type days rather than nursery days. . . . A regular well-baby nursery may not be considered an intensive care type unit.

That again may reasonably be taken to suggest that only well-baby nursery beds are to be excluded from the bed count in calculating the IME adjustment.

To eliminate any lingering ambiguity surrounding her bed-counting policy, effective August 25, 1988 Secretary issued PRM 2405.3(G) to revise the definition of available bed:

> A bed is defined for this purpose as an adult or pediatric bed (exclusive of beds assigned to newborns which are not in intensive care areas, custodial beds, and beds in excluded units) maintained for lodging inpatients, including beds in intensive care units, coronary care units, neona-

tal intensive care units, and other special care inpatient hospital units.

If applicable here, that revision certainly resolves the present dispute: It specifically excludes from the bed count only beds assigned to babies in the healthy newborn nursery, not those in a neonatal intensive care unit.

Hospital argues that the application of that interpretive rule, because promulgated after the fiscal 1988 cost reporting, would constitute an impermissible act of retroactive rulemaking (see *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). Secretary responds by urging that the rewording of the "available bed" definition did not effect a substantive change in Secretary's bed-counting rules— that the sole function of the revision was rather to state more clearly what the law already was: Secretary's longstanding position that only beds in a nursery for healthy newborns are excluded from the bed count.

▮ It is well established that if a revision is characterized as a substantial change in the law rather than as a clarification of existing policy, its retroactive application could pose a series of potential constitutional problems.[12] But agency rules that merely interpret or clarify, as opposed to effecting a substantive change in, existing law are properly applicable to disputes that arose before they were promulgated (*Pope v. Shalala*, 998 F.2d 473, 482–86 (7th Cir.1993)). There is no question that Secretary issued PRM 2405.3(G) in a effort to clarify what was already her longstanding bed-counting policy. Thus the application of that interpretive guideline to resolve the present dispute would not be improper.

▮ Even were that not the case, this Court would still be constrained to uphold Secretary's construction of Reg. § 412.118(b). As stated earlier, the phrase "not including beds assigned to newborns" is instinct with ambiguity. It could (as Hospital asserts) be

**12.** This is a subject with which this Court has more than passing familiarity. It has very recently authored an opinion for the Court of Appeals for the Ninth Circuit that deals with the proper reading—whether as a change or as a clarification—of a congressional amendment to a statute that treats with the complex Medicare–Medicaid statutory interaction and its effect on provider reimbursements (*Beverly Community Hosp. Ass'n v. Belshe*, 132 F.3d 1259 (9th Cir. 1997)).

read to mandate the exclusion of all beds assigned to newborns, including bed days attributable to neonatal intensive care units. But conversely, the phrase can just as easily be read to call only for the exclusion of bassinets in the healthy newborn nursery (as Secretary posits). Where each side proffers a plausible construction of the governing regulation's ambiguous language, their conflicting interpretations do not compete on a level playing field. As *Thomas Jefferson*, 512 U.S. at 512 teaches, Medicare's "complex and highly technical regulatory program" warrants substantial deference to an agency's interpretation of its own regulations. And because Secretary's interpretation is neither "plainly erroneous [n]or inconsistent with the regulation" (*id.*), it must be accorded controlling weight. This Court therefore holds that Reg. § 412.118(b) excludes from the bed count only beds assigned to babies in the healthy newborn nursery.

Hospital next contends that even if Secretary's interpretation of Reg. § 412.118(b) prevails, Hospital's neonatal unit does not qualify as an intensive care unit, so that the unit's nine beds were improperly included in the IME bed count. Reg. § 413.53(d) sets forth six objective criteria to assess whether a hospital unit qualifies as an "intensive care type unit." Secretary has adduced substantial evidence to match those criteria to Hospital's neonatal unit:

1. Of course the nine bed neonatal unit is in a hospital (Complaint ¶ 14).

2. According to the testimony of Hospital's NICU manager Mary Grimm ("Grimm"), the unit is "physically and identifiably separate" from the healthy newborn nursery, and it maintains its own nursing staff (R. 177–80).[13]

3. Specific written policies govern admission to and discharge from the neonatal unit (R. 151, 242, 376–78).

4. Two registered nurses are on duty at all times in the neonatal unit (R. 197).

5. Reg. § 413.53(d)(5) mandates a minimum nurse-patient ratio of 1 to 2, which translates to 12 nursing hours per patient day. After examining Hospital's Medicare work papers for the 1988 year, Blue Cross determined that Hospital devoted 17.31 nursing hours per patient day. Hospital contests that determination and instead claims—though only anecdotally, not with documented support—that the figure is 12 hours (though it acknowledges that the figure rises to 14.20 hours if a nurse's aid who did not provide patient care is included) (R. 66–67, 90, 182–83).[14] Even assuming the correctness of Hospital's purported 12–hour figure, the federal mandate is met.

6. Grimm also testified that the neonatal unit is equipped with life-saving equipment necessary to treat critically ill patients (R. at 200–02).[15]

Finally, though self-characterization is not one of the regulatory criteria, it is noteworthy that before the submission of its 1988 cost report Hospital itself classified its neonatal unit as an intensive care type unit. Only when it realized that such a classification would reduce its reimbursement under PPS did it contest that label (R. 500).

In response Hospital points to other factors that it asserts would support a determination that the NICU does not satisfy the "intensive care type unit" regulatory criteria. Here they are:

1. For its own classification purposes, the State of Illinois certified the NICU as an "intermediate unit." But of course federal and not state standards govern whether a provider's neonatal beds should be included in the bed count for purposes of calculating the IME adjustment under Medicare.

2. Dr. Kwang Sun Lee, a neonatologist, testified that the level of care in Hospital's neonatal unit was typical of an intermedi-

---

**13.** When Hospital submitted its 1988 cost report, the NICU was located on Hospital's ninth floor and the nursery was on the seventh. Sometime thereafter the NICU moved down to a location on the seventh floor adjacent to, but still physically separate from, the nursery (R. 178–79, 198).

**14.** During 1988 the comparable figure for the healthy newborn nursery was a substantially low-

er 6.69 nursing hours, while the intensive care unit accounted for 16.51 nursing hours, per patient day (R. 90).

**15.** Blue Cross' audit revealed $250,000 worth of equipment in the NICU, as contrasted with $83,-000 in the nursery (R. 86, 246–47).

ate care unit, not an intensive one (R. 152–55). Dr. Lee also said that in accordance with Illinois state law Hospital transferred serious cases to another hospital that had a neonatal intensive care unit. But he acknowledged that Hospital's own neonatal unit had the necessary equipment to respond to life-threatening situations and that the stabilization of critically ill infants occurred before any such transfer (R. 150–65).

3. Grimm contends that the nurse-patient ratio was 3 to 1 per patient day (R. 180). Yet as stated earlier, she also acknowledges that there were 12 nursing hours per patient day (R. 182–183).

■ Even apart from the greater weight that must be attached to the direct parallels between the factual situation and the regulatory criteria than to the weight that Hospital seeks to ascribe to other more random factors, at best Hospital's contentions confirm that what was posed to Secretary involved a judgment call. And it cannot be said, in light of the close correlation between the true factual matrix and the regulatory standards, that Secretary's determination on the critical "intensive care type unit" issue was arbitrary and capricious—indeed, a powerful argument can be made that a decision going the other way would have been vulnerable to rejection under that standard.

What has been said here is a necessary consequence of the highly deferential arbitrary and capricious standard of review. Under that standard, such questions of judgment are within Secretary's purview. Indeed, as *St. Elizabeth Hosp., Inc. v. Bowen,* 797 F.2d 449, 455 (7th Cir.1986) has observed in upholding a regulatory interpretation by Secretary as reasonable:

> Classification [of hospital units] for cost purposes is an area where judgment and discretion must always play a significant role.

Because Secretary surely had a reasonable basis for her inclusion of Hospital's neonatal beds in the IME bed count, her informed decision fell within the discretionary authority vested in her as confirmed by *Thomas Jefferson.* That ends the inquiry.

## GME Adjustment

Hospital next contends that Secretary improperly included its nine NICU beds in the GME patient load calculation. As stated earlier, teaching hospitals that participate in the Medicare program are eligible to be reimbursed for certain GME costs attributable to Medicare services. In 1986 the enactment of Section 1395ww(h) revised the methodology for calculating GME payments for cost reporting periods beginning on or after July 1, 1985. Section 1395ww(h)(3)(A) makes that complex statutory formula depend in part on a hospital's "medicare patient load," defined this way in Section 1395ww(h)(3)(C):

> As used in subparagraph (A), the term "medicare patient load" means, with respect to a hospital's cost reporting period, the fraction of the total number of inpatient-bed-days (as established by the Secretary) during the period which are attributable to patients with respect to whom payment may be made under part A of this subchapter.

That definition expressly authorizes Secretary to decide how to calculate inpatient-bed-days. In 1989 Secretary promulgated Reg. § 413.86 in an exercise of that broad statutory grant of authority. Reg. § 413.86(b), which elaborates on the definition of "medicare patient load," provides in relevant part:

> In calculating inpatient days, inpatient days in any district [sic] part of the hospital furnishing a hospital level of care are included and nursery days are excluded.

And Secretary has interpreted the regulatory phrase "nursery days are excluded" as calling for the exclusion of beds only in a healthy newborn nursery, but not beds in a neonatal intensive care unit.

Hospital objects that the application of that 1989 regulation to its earlier-submitted 1988 cost report violates the longstanding presumption against retroactivity. In response Secretary contends that the text of Section 1395ww(h) evinces a clear congressional intent to authorize retroactive rulemaking, and "where the congressional intent is clear, it governs" (*Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990)). But those competing contentions need not be ad-

dressed at all under the circumstances involved here.

■ Even before it is appropriate for a court to address whether a statute speaks with the requisite clarity to justify retroactive rulemaking, the court should first ascertain whether the contested provision and its implementing regulations actually effect a substantive change in the law. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)(internal citations and footnote omitted) supplies the test to decide when a statute (or by natural extension a regulation) operates retroactively:

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment.

■ Here Reg. § 413.86(b) does not effect a substantive change in existing law, but rather comports with the longstanding Medicare bed-counting policy used to calculate the IME adjustment. As stated earlier in this opinion, long before Hospital submitted its 1988 cost report Secretary had adopted and adhered to the view that a reference to "nursery beds" in the IME regulations meant beds assigned to infants in a healthy newborn nursery, not to those in a neonatal intensive care unit. And it is surely reasonable for Secretary to give the comparable words the same meaning for GME purposes that has been ascribed to them in the IME adjustment context. Therefore, even though Reg. § 413.86(b) was promulgated after Hospital submitted its 1988 cost report, it does not "attach[] new legal consequences to events completed before its enactment." Its application in calculating the GME adjustment is thus warranted (see *Pope*, 998 F.2d at 482–86).

*Loss on Sale of Land*

Hospital further challenges Secretary's decision that Board lacked jurisdiction to hear its added claim concerning reimbursement for loss on the sale of land. At the time that Hospital submitted its 1988 cost report to Blue Cross, PRM 233.3A provided that a loss on advance refunding of debt could not be claimed in a single year, but rather had to be amortized over the life of the debt. Ignoring that interpretive rule, Hospital offset its entire $2.5 million loss on advance refunding of debt against its investment income, which reduced Hospital's net income to zero. Hospital points to the fact that PRM 202.2 does not permit losses in excess of income to be included on the Medicare cost report, and it asserts that it did not claim its land loss on its 1988 report because that adjustment would have impermissibly reduced its net investment below zero.

After Hospital's submission of the list of issues to be disputed before Board, the Supreme Court's 1995 decision in *Guernsey Mem'l Hosp.* upheld PRM 233.3A, the effect of which was to reduce substantially the loss that Hospital could claim on its 1988 cost report. Faced with positive net investment income, Hospital then tried to amend its 1988 appeal before Board by adding the previously unclaimed loss on sale of land. In response Secretary contends that Hospital jurisdiction over that issue is lacking.

Section 1395oo(a) outlines Board's three jurisdictional requirements. As indicated in an earlier section of this opinion, a provider may obtain a hearing before Board with respect to its fiscal intermediary's determination of its cost report only if:

1. As one of the alternatives under Section 1395oo(a)(1), the provider is dissatisfied with a final determination of its fiscal intermediary as to the amount of reimbursement due to the provider for the period covered by such report.

2. There is $10,000 or more in controversy.

3. Where the alternative in paragraph 1 is the basis for jurisdiction, the provider must have filed a request for a hearing within 180 days after the intermediary's final determination.[16]

---

16. Board may take jurisdiction of late-filed appeals "for good cause shown" (Reg.

§ 405.1841(b)).

With the second and third of those standards admittedly having been met, what is at issue here is the "dissatisfaction" prerequisite to jurisdiction.

Because both sides agree that *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988) controls the question (though they differ as to its impact), a brief review of that decision is in order. There the provider had "self-disallowed" certain claims from the cost report submitted to its intermediary, in order to comply with a Medicare regulation that it intended to challenge before Board. When the hospital later tried to make that challenge the Board claimed that it lacked jurisdiction to hear the appeal, reasoning that a provider that failed to claim certain costs could not be "dissatisfied" with the intermediary's determination within the meaning of Section 1395oo(a). But a unanimous Supreme Court rejected that position, explaining (485 U.S. at 404):

> We agree that, under subsection (a)(1)(A)(i), a provider's dissatisfaction with the amount of its total reimbursement is a condition to the Board's jurisdiction. It is clear, however, that the submission of a cost report in full compliance with the unambiguous dictates of the Secretary's rules and regulations does not, by itself, bar the provider from claiming dissatisfaction with the amount of reimbursement allowed by those regulations.

This of course is not a case where the provider Hospital self-disallowed any claim in order to comply with a Medicare regulation that it intended to challenge before Board. Instead the scenario presents a very different question: whether a provider that voluntarily chooses *not* to submit to its intermediary "a cost report in full compliance with the unambiguous dictates of the Secretary's rules and regulations" may then seek reimbursement for costs to which it later says it would have been entitled under the applicable rules. *Bethesda, id.* at 404–05 itself recognized that distinction and went on to qualify its holding:

> Thus, petitioners stand on different grounds than do providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules. While such defaults might well establish that a provider was satisfied with the amounts requested in its cost report and awarded by the fiscal intermediary, those circumstances are not presented here.

Just those circumstances *are* presented here. Medicare regulations did not prohibit Hospital from claiming the desired reimbursement. Quite to the contrary, had Hospital adhered to the applicable rules, which instructed it not to claim the entire loss on advance refunding of debt, it would have had remaining investment income from which to offset the loss on sale of land. In earlier litigation involving Hospital, *Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala*, 24 F.3d 984, 993 (7th Cir.1994) interpreted the last-quoted *Bethesda* language as signaling a probable estoppel that would bar Hospital from claiming to be dissatisfied under those circumstances:

> This language strongly suggests that a hospital that does not ask its intermediary to reimburse it for all of the costs for which it is entitled to be reimbursed cannot, on appeal to the Board, first ask for new costs.

■ This Court accepts that "strong suggestion" and declines to extend *Bethesda*'s holding to the situation posed here, an extension that it too believes to be contraindicated by *Bethesda* itself. That being so, this Court holds that Hospital's failure to include the loss on sale of land in the initial cost report submitted to Blue Cross does preclude it from claiming "dissatisfaction" at a later date. Because Hospital thus has not satisfied the first condition of Section 1395oo(a), Secretary properly concluded that Board lacks jurisdiction under that section to hear the claim concerning loss on the sale of land.

■ To escape that outcome, Hospital advances an alternative position that jurisdiction over the loss on sale of land issue exists under Section 1395oo(d):

> The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report...even though such matters were not considered by the intermediary in making such final determination.

Hospital posits that the land loss, though not expressly claimed in its 1988 cost report, was nonetheless indirectly reflected in that report through the zero investment income determination. And because that land loss was incurred during the period for which the 1988 cost report was filed, Hospital urges that it was "covered by such cost report."

That position, however, ignores the place that Section 1395*oo*(d) occupies in Medicare's statutory structure. That provision does not confer jurisdiction, but rather merely sets forth Board's powers and duties *after* its jurisdiction has properly been invoked under Section 1395*oo*(a). As *Bethesda*, 485 U.S. at 406 (emphasis added) itself said:

> This [Section 1395*oo*(d)] language allows the Board, *once it obtains jurisdiction pursuant to subsection (a)*, to review and revise a cost report with respect to matters not contested before the fiscal intermediary.

Thus Hospital cannot use Section 1395*oo*(d) to bootstrap an untimely challenge or claim into the Section 1395*oo*(a) appeals process.

Although our Court of Appeals has not had occasion to address this question directly, its recognition of the just-stated distinction is certainly implied by its successive opinions in *Edgewater Hosp., Inc. v. Bowen.* Its initial opinion in that case (857 F.2d 1123 (7th Cir.1988)) could have been read as finding authority in Board under Section 1395*oo*(d) to consider matters outside of the cost reports even if the costs had not been claimed for reimbursement (*id.* at 1134):

> [W]e hold that, since the Board has jurisdiction to review any matter covered by the cost report at issue, *see* 42 U.S.C. § 1395*oo*(d), even if that matter was an

unclaimed cost, *see Bethesda Hospital,* [485 U.S. at 404], it certainly has jurisdiction to review the properly claimed cost items of Edgewater Hospital.

But a few months after the issuance of that opinion, our Court of Appeals modified it (in response to a motion for rehearing directed to that precise issue) by expressly deleting the phrase "even if that matter was an unclaimed cost" (866 F.2d 228 (7th Cir.1989)). That very amendment directly buttresses the analysis and the result announced here. Secretary has properly concluded that Board lacked jurisdiction to review the issue of Hospital's loss on sale of land.

### Constitutional Claim

 Finally Hospital argues that Secretary's reversal of Board's decision, a conclusion reached without affording Hospital an opportunity to present evidence and cross-examine witnesses, violates the due process rights guaranteed by the Fifth and Fourteenth Amendments. Even apart from the mystery of how the latter Amendment can get into the act at all (see n.3), that contention is entirely without merit. Hospital suggests nothing of an evidentiary nature that could have been proffered as additional grist for the decisional mill, over and above what is already encompassed within the administrative record. And Hospital's legal due process arguments are subsumed within the provider's arbitrary and capricious arguments addressed earlier in this opinion, so that no need exists to rehash those issues.

### Conclusion

There is no genuine issue of material fact, and Secretary is entitled to a judgment as a matter of law.[17] That conclusion compels the

---

**17.** This extended excursion (odyssey might be a more appropriate description) through a statutory and regulatory maze that forms part of Medicare's extraordinarily opaque verbiage (in *Beverly Community Hosp. Ass'n* this Court quoted a similar characterization from *Rehabilitation Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir.1994: "among the most completely impenetrable texts within human experience") has been greatly aided by the pathfinding work of this Court's very able law clerk, Jason Romick, Esq. As always in such cases, the advocacy by the competing counsel—who quite properly devote their efforts to serving up material that support their respective clients' positions—leaves gaps that can only be filled by the work of the court's own clerks, with their quite different responsibility to provide more objective input. That has certainly been the case here, where clerk Romick has performed that role in typically admirable fashion. Having said that, this Court hastens to add (as it always does in paying tribute to its invariably outstanding law clerks) that it has painstakingly reworked each sentence and read each case cited in this opinion (and, of course, other cases as well), so that the end product is totally this Court's own. If then there are any errors that have found their way into the final version of this opinion, the sole responsibility is this Court's and not that of its law clerk.

granting of Secretary's Rule 56 motion and the corresponding denial of Hospital's cross-motion. This action is dismissed with prejudice.