*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BARBARA COMBS,

*Plaintiff-Appellant,*

*v.*

No. 04-5275

COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 03-00240—Jennifer B. Coffman, District Judge.

Argued: December 7, 2005

Decided and Filed: August 16, 2006

Before: BOGGS, Chief Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, and NEILSON,* Circuit Judges.

_____

## COUNSEL

**ARGUED:** Timothy N. Despotes, Richmond, Kentucky, for Appellant. Catherine Y. Hancock, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Timothy N. Despotes, Richmond, Kentucky, for Appellant. Catherine Y. Hancock, Thomas M. Bondy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Reginald Speegle, OFFICE OF GENERAL COUNSEL, SOCIAL SECURITY ADMINISTRATION, Atlanta, Georgia, for Appellee.

ROGERS, J., announced the judgment of the court and delivered an opinion in which BOGGS, C. J., BATCHELDER, GIBBONS, SUTTON, COOK, and McKEAGUE, JJ., joined. GILMAN, J. (pp. 12-15), delivered a separate opinion concurring in the judgment. GRIFFIN, J. (pp. 16-20), delivered a separate opinion concurring in part and dissenting in part. CLAY, J. (pp. 21-33), delivered a separate dissenting opinion, in which MARTIN, DAUGHTREY, MOORE, and COLE, JJ., joined.

_____

*The Honorable Susan Bieke Neilson, who was a member of the panel, died on January 25, 2006.

1

---

**OPINION**

---

ROGERS, Circuit Judge. This case presents the question of whether a change in a rule governing the adjudication of social security disability benefits claims that is applied as of its effective date to all pending cases has an impermissibly retroactive effect. In 1999 the Social Security Administration required more detailed proof of disability from obese claimants by eliminating a presumption of disability for obesity. Such presumptions govern the process of administrative adjudication. Changes to such rules, therefore, have their primary effect on claimants' applications when the claimants appear before the agency to have their claims decided on the merits. The change in the rule is thus not impermissibly retroactive.

Plaintiff Barbara Combs initially filed an application for social security disability benefits in November of 1996. At that time, the Social Security Administration (SSA) afforded obese claimants a generous presumption of disability. The Social Security Commissioner deleted obesity from the list of conditions that benefit from this presumption in 1999. In 2003 Combs' claim came before an Administrative Law Judge (ALJ) on remand from an administrative appeal. The ALJ denied her claim for benefits due in part to the deletion of this obesity listing. Combs appealed the decision administratively without success. She then filed suit in federal district court. There Combs argued that the agency had exceeded its powers granted by the Social Security Act (the Act) by applying the changed listings to her claim retroactively. The Act does not generally give the SSA the power to promulgate retroactive regulations. 42 U.S.C. § 405(a); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 & n.3 (1988).

The district court rejected Combs' arguments, holding that the SSA had properly determined her eligibility for benefits without analyzing the deleted listing. This appeal followed. Because the changed listing had its effect on Combs' claim after its effective date, when Combs' claim was administratively adjudicated, it was not impermissibly retroactive in its effect. Moreover, the district court correctly concluded that the Agency's determination in this case is supported by substantial evidence. We therefore affirm.

An understanding of the effect of the change in the regulation requires a brief look at the five-step procedure used by the SSA to determine eligibility for disability benefits. The Act entitles to benefits payments certain claimants who, by virtue of a medically determinable physical or mental impairment of at least a year's expected duration, cannot engage in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). Such claimants qualify as "disabled." *Id.* A claimant qualifies as disabled if she cannot, in light of her age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). To identify claimants who satisfy this definition of disability, the SSA uses a five-step "sequential evaluation process." 20 C.F.R § 404.1520(a)(4). The five steps are as follows:

In step one, the SSA identifies claimants who "are doing substantial gainful activity" and concludes that these claimants are not disabled. *Id.* § 404.1520(a)(4)(i). If claimants get past this step, the SSA at step two considers the "medical severity" of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with impairments of insufficient duration are not disabled. *See id.* Those with impairments that have lasted or will last at least twelve months proceed to step three.

At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. *Id.*

§ 404.1520(a)(4)(iii), (d).  The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity.  *See Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability.  For such claimants, the process ends at step three.  Claimants with lesser impairments proceed to step four.

In the fourth step, the SSA evaluates claimants' "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled.  *Id.* § 404.1520(a)(4)(iv), (f).  "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it.  *Id.* § 404.1560(b)(1).  Claimants who can still do their past relevant work are not disabled.  Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past relevant work.  *See id.* § 404.1520(a)(4)(v), (g)(1).  Claimants who can perform such work are not disabled.  *See id.*; § 404.1560(c)(1).  The SSA bears the burden of proof at step five.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

For use at step three, the Commissioner has promulgated an extensive list of impairments.  *See generally* 20 C.F.R. Part 404, Subpart P, Appx. 1 (2005).   The list includes dozens of conditions, ranging from problems of the musculoskeletal system to skin disorders to malignant neoplastic diseases.  *See id.*  As late as 1999, obesity was a listed impairment.  20 C.F.R. Part 404, Subpart P, Appx. 1, § 9.09 (1999).  The 1999 listing for obesity stated:

> 9.09 Obesity. Weight equal to or greater than the values specified in Table I for males, Table II for females (100 percent above desired level), and one of the following:
>
> A. History of pain and limitation of motion in any weight-bearing joint or the lumbosacral spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the affected joint or lumbosacral spine; or
>
> B. Hypertension with diastolic blood pressure persistently in excess of 100 mm. Hg measured with appropriate size cuff; or
>
> C. History of congestive heart failure manifested by past evidence of vascular congestion such as hepatomegaly, peripheral or pulmonary edema; or
>
> D. Chronic venous insufficiency with superficial varicosities in a lower extremity with pain on weight bearing and persistent edema; or
>
> E. Respiratory disease with total forced vital capacity equal to or less than 2.0 L. or a level of hypoxemia at rest equal to or less than the values specified in Table III-A or III-B or III-C.

*Id.*

The Commissioner deleted listing 9.09 effective October 25, 1999, following notice and comment.  64 Fed. Reg. 46122, 46123 (Aug. 24, 1999).  The Commissioner explained this decision by noting that the criteria in listing 9.09 "were not appropriate indicators of listing-level severity because they did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity."  *Id.* at 46124.  In its program and adjudicative experience,

the SSA became convinced that the listing had "required findings of disability in some cases in which the claimants were clearly not 'disabled' as defined in the Act." *Id.* at 46125. Although obesity was no longer a separately listed impairment under step three, the Commissioner explained that obese claimants can still prevail at step three by proving that their obesity combined with other ailments equals the severity of a different listed impairment. *See id.* at 46123. Indeed, the Commissioner simultaneously amended the introductory text to the musculoskeletal, respiratory, and cardiovascular systems listings to give guidance regarding obesity's potential to combine with other impairments at step three. *See id.* at 46123, 46128-29.

The deletion of listing 9.09, the Commissioner stated in response to comments, would have prospective effect only. *See id.* at 46127. "We will not review prior allowances based on listing 9.09 under the new rules," the agency explained. *Id.* The revised listings were to apply to pending applications for benefits, i.e., claims filed but not yet finally adjudicated before listing 9.09 was deleted. *See Social Security Ruling, SSR 02-1 p; Titles II and XVI: Evaluation of Obesity*, 67 Fed. Reg. 57859, 57863 (Sept. 12, 2002); *Social Security Ruling, SSR 00-3 p; Titles II and XVI: Evaluation of Obesity*, 65 Fed. Reg. 31039, 31042 (May 15, 2000) (superseded by SSR 02-1 p).

Combs first filed for disability benefits with the SSA on November 4, 1996. She alleged in her application that she had been disabled since May 30, 1996, due to a wide variety of impairments. The SSA initially denied Combs' application in December of 1996, and upon reconsideration a few months later in February of 1997. Combs requested a hearing before an ALJ later that year in August. The ALJ denied Combs' request for a hearing in January of 1998. Combs appealed the 1998 denial to the Appeals Council. The Council reversed the ALJ's decision in October of 1998, granting Combs' request for a hearing. In the subsequent hearing in March of 1999, the ALJ denied Combs' claim under the five-step test. The ALJ did not find that Combs' obesity and other impairments were severe enough for her to prevail at step three under listing 9.09 for obesity or any other listing. The ALJ denied her claim at step five. Combs appealed the ALJ's decision administratively.

During the pendency of her administrative appeal, the Agency deleted listing 9.09 for obesity on October 25, 1999. The Appeals Council in March of 2000 vacated the ALJ's 1998 denial of benefits and remanded Combs' claim for further consideration. On remand, the ALJ in September of 2001 again at step five determined that Combs was not disabled. The ALJ observed at step three that Combs' medically determinable "impairments do not meet or medically equal one of the listed impairments" needed for her to prevail. Admin. R. at 213. Combs appealed once again. In September of 2002, the Appeals Council vacated the ALJ's 2001 decision and remanded the matter to a different ALJ.

This second ALJ issued a decision on February 21, 2003, denying Combs' claim at step five. The ALJ identified Combs' medically determinable impairments and concluded, like the previous ALJ, that they "do not meet or medically equal one of the listed impairments" that could entitle her to benefits at step three. Admin. R. at 27. Combs administratively appealed again, this time without success. The second ALJ's 2003 denial of benefits became the Agency's final decision.

Combs sought review of the 2003 denial of benefits in the district court below. The district court granted the SSA's motion for summary judgment, thereby upholding the 2003 denial of benefits. In its opinion, the district court held that the agency's determination was supported by substantial evidence. The district court also concluded that the SSA acted properly when it did not apply former listing 9.09 to Combs' claim, because that listing had been deleted prior to the 2003 hearing.

The district court properly refused to require the SSA to apply listing 9.09, notwithstanding the fact that Combs' claim was initially filed before the deletion of that listing. Combs argues that

the application of the current version of the listing was improper because application of the current listing had a retroactive effect on Combs, by virtue of the fact that she had filed her claim before the change in the listing.

While Congress has the power to permit the SSA to promulgate retroactive regulations, Congress generally has not done so. *Bowen*, 488 U.S. at 213 & n.3. Neither party in this case argues that Congress has authorized the SSA to promulgate regulations that would operate "retroactively," where such retroactivity is of the type that would be presumed to be against the intent of Congress if the provision were contained in a statute. We accordingly assume, for purposes of our analysis of whether the regulation at issue in this case is consistent with the statute, that we are to apply the same analysis that we would apply in determining whether a statute—unless construed otherwise—operates retroactively so as to invoke the Supreme Court's presumption against retroactivity. In other words, the regulations as of October 25, 1999, are consistent with the Social Security Act if they are not retroactive under the tests that the Supreme Court has used to determine whether certain unclear federal statutes operated retroactively. In *Landgraf v. USI Film Products*, the Court held that the application to pre-amendment activity of amendments to Title VII of the Civil Rights Act, newly providing for compensatory and punitive damages, would violate the presumption against retroactive legislation. 511 U.S. 244, 247 (1994). Later in *Republic of Austria v. Altmann*, the Court held that application to pre-statute activity of exceptions to sovereign immunity contained in the 1976 Foreign Sovereign Immunities Act did not violate the presumption against retroactive legislation. 541 U.S. 677, 692-700 (2004). Assuming the applicability of the *Landgraf-Altmann* distinction to the issue of agency power presented in this case, it is apparent that the regulatory change in this case is not impermissibly retroactive.

As *Landgraf* teaches, not all statutes raise retroactivity concerns. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . ." 511 U.S. at 269; *Campos v. INS*, 16 F.3d 118, 122 (6th Cir. 1994); *Patel v. Gonzales*, 432 F.3d 685, 690 (6th Cir. 2005). The application of law existing at the time of decision does not violate the presumption against retroactivity unless the statute in question has retroactive effects. *Landgraf*, 511 U.S. at 269-70; *Patel*, 432 F.3d at 690. A statute has retroactive effects if the statute

> attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. . . . [F]amiliar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Landgraf*, 511 U.S. at 270.

The factors articulated in *Landgraf*—fair notice, reasonable reliance, and settled expectations—weigh against finding a retroactive effect. *See id.* at 269-70. It can hardly be argued that claimants become obese or otherwise become impaired in reliance on the availability of the presumption in the listing. Nor is there any indication that they file their claims, or decide what to put in their claims, based on how the agency determines whether they meet the statutory requirements for disability eligibility. Similarly, claimants have no settled expectation that the agency will use one as opposed to another algorithm for determining whether the statutory requirements are met. Finally, there is no basis for claimants to argue that they need "fair notice" of a change in the step three presumptions.

This analysis tracks precisely the reasoning of our recent decision in *Patel v. Gonzales*. In that case we dealt with two versions of a statutory provision for discretionary waiver of removal of

relatives of U.S. citizens. The older version applied to parents, spouses, or children of U.S. citizens; the newer version did not apply to parents. We held that the newer version applied to the Patels, even though they fraudulently entered the United States (i.e., committed the acts that formed the basis for their removal) before the change in the statute. Application of the later version of the statute was not impermissibly retroactive because

> The factors articulated in *Landgraf*—fair notice, reasonable reliance, and settled expectations—weigh against finding a retroactive effect. In likelihood, Petitioners did not enter the United States through fraud in reliance on the availability of the discretionary waiver. Nor did Petitioners have a settled expectation, given the fact that Petitioners' son was not a naturalized citizen in 1993, that they would receive a discretionary waiver based on their relationship with their son. Finally, unless Petitioners had notice of the waiver in the first place, they cannot rely on the argument that they need "fair notice" of the change.

*Patel*, 432 F.3d at 691 (citation omitted). It is less likely that Combs became impaired in reliance on the unamended listing than that the Patels entered the United States fraudulently in reliance on the availability of a discretionary waiver.[1] It is less apparent that Combs had a settled expectation that a certain procedure would apply to her in the determination of her disability than that the Patels had a settled expectation that their son would become a U.S. citizen, thereby entitling them to seek a waiver. And finally, there is no more basis for saying Combs needed "fair notice" of the listing change than for saying the Patels needed notice of the change in the availability of a discretionary waiver. Our decision in *Patel* thus strongly supports our conclusion that the listing change was not impermissibly retroactive with respect to Combs.

Moreover, the Supreme Court in *Landgraf* and *Altmann*, and our court in *Patel*, have recognized that changes to procedural rules generally do not have retroactive effect because procedural rules regulate secondary as opposed to primary conduct. *See Landgraf*, 511 U.S. at 275; *Altmann*, 541 U.S. at 693; *Patel*, 432 F.3d at 690. In contrast, rules that deprive persons of vested substantive rights may have retroactive effects if applied to conduct occurring prior to their enactment. *See Landgraf*, 511 U.S. at 272, *Altmann*, 541 U.S. at 693; *Patel*, 432 F.3d at 690. Thus, the Supreme Court has distinguished between provisions involving the right to a jury and the lifting of sovereign immunity as being on the non-substantive side of the line, while the addition of new elements of damages are on the substantive side of the line. *See Altmann*, 541 U.S. at 696 (foreign sovereign immunity); *Landgraf*, 511 U.S. at 280-81 (right to a jury trial is procedural but new right to compensatory and punitive damages is substantive). Applying this distinction, the change in step three is more procedural than substantive in nature. The ultimate criteria of disability eligibility are not changed. Instead, a presumption designed for administrative workability was changed to conform agency determinations more closely with the statutory requirements. While the change may be outcome-determinative for some claimants, the same can be said for a jury trial right or the lifting of an immunity. The difference has to do with whether there is a change in substantive obligation as opposed to a change in the way in which the same obligation is adjudicated. In that light, the change in administrative presumption in step three is more like the latter. The substantive

---

[1]We draw this comparison to show that our decision comports with our reasoning in *Patel*, not to attribute central significance to the question of whether or not claimants become disabled in reliance upon social security listings. In any event, it cannot be that the listing change is impermissibly retroactive because claimants base their insurance planning (as opposed to their becoming disabled) on the presumptions contained in disability listings. If so, the old listing would have to apply to disability applicants who engaged in such planning before the listing was changed. We do not understand Combs to be arguing for such deep rigidity in the listings. Instead, Combs argues for application of the old listing to claims *filed* before the effective date of the new listing. Any argument that the old listing applies to claims of persons who could have based their insurance planning on the old listing would effectively preclude (at least for many, many years) any listing change that does not benefit claimants. The argument thus proves too much.

requirements for disability eligibility have not changed, only the way in which the agency goes about determining whether they are present. Doubtless there are situations in which a procedural rule will have such substantive effects, *see Landgraf*, 511 U.S. at 275 n.29 ("[n]or do we suggest that concerns about retroactivity have no application to procedural rules"), but the modification of the step three listing does not fall on the substantive side of the distinction.

Our conclusion is buttressed by the requirement—suggested in *Landgraf* and emphasized in *Altmann*—that we focus on the "relevant conduct regulated by the [legislative provision]" to determine whether the provision is impermissibly retroactive. In *Landgraf*, the Supreme Court explained that "[t]he conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law *and the degree of connection between the operation of the new rule and a relevant past event*." 511 U.S. at 270 (emphasis added). The *Altmann* Court focused on this aspect of the *Landgraf* analysis. It reasoned that the past event relevant to whether a limitation on foreign sovereign immunity was retroactive was the *claim of immunity*, not the underlying government action that was the basis for the lawsuit. *See Altmann*, 541 U.S. at 697-98. The Foreign Sovereign Immunities Act was intended to change the framework for determining liability of foreign states, more than the substantive content of that liability. *See id.* In making this analysis the Court quoted with approval the following passage from Justice Scalia's *Landgraf* concurrence:[2]

> The critical issue, I think, is not whether the rule affects 'vested rights,' or governs substance or procedure, but rather what is the relevant activity that the rule regulates. Absent clear statement otherwise, only such relevant activity which occurs *after* the effective date of the statute is covered. Most statutes are meant to regulate primary conduct, and hence will not be applied in trials involving conduct that occurred before their effective date. But other statutes have a different purpose and therefore a different relevant retroactivity event.

*Id.* at 697 n.17 (quoting *Landgraf*, 511 U.S. at 291 (Scalia, J., concurring in judgment)).

A focus on the "relevant activity" in this case leads inexorably to the conclusion that the change in the regulation was not impermissibly retroactive. The relevant activity is the agency application of the five-step procedure, not the date when claimant asserts that disability started, or

---

[2] It is true that courts have, in contexts quite distinct from the retroactivity inquiry at issue in this case, regarded burden of proof as "substantive." As *Altmann* makes clear, a statute that has been held to be substantive in one context is not thereby made substantive for retroactivity purposes. The Court's prior holding that the Foreign Sovereign Immunities Act is substantive for purposes of jurisdiction did not mean that it was also substantive for retroactivity purposes. *See Altmann*, 541 U.S. at 695-96. Thus the cases cited in the dissents regarding the substantive nature of burdens of proof for other-than-retroactivity analysis are of little relevance to a retroactivity analysis. *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20-21 (2000) (federal vs. state law under the Bankruptcy Act); *Dick v. N.Y. Life Ins. Co.*, 359 U.S. 437, 446 (1959) (federal vs. state law in a diversity case under under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *Cent. Vt. Ry. Co. v. White*, 238 U.S. 507, 511-12 (1915) (federal vs. state law under Federal Employers' Liability Act); *Blue Diamond Coal Co. v. United Mine Workers of Am.*, 436 F.2d 551, 563 (6th Cir. 1970) (federal vs. state law under the Labor Management Relations Act); *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 378 (1998) (dictum regarding power of National Labor Relations Board to make policy by means of rulemaking rather than adjudication); *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 271 (1994) (whether burden of proof is a "technical or formal rule of procedure" under the Longshore and Harbor Workers' Compensation Act and therefore exempt from the requirements of the Administrative Procedure Act).

There are, it might also be added, other-than-retroactivity contexts where burden of proof *is* deemed "procedural," such as ordinary conflict-of-laws practice in the several states. *See* Restatement (Second) of Conflict of Laws §§ 133-34 (1971); *see, e.g., Md. Cas. Co. v. Williams*, 377 F.2d 389, 394 (5th Cir. 1967); *Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.*, 661 N.Y.S.2d 948, 949 (N.Y. Sup. Ct. 1997); *Abalene Pest Control Serv., Inc. v. Orkin Exterminating Co.*, 395 S.E.2d 867, 869 (Ga. Ct. App. 1990); *Waite v. Krug Banking Co.*, 136 A.2d 347, 348 (Conn. Sup. Ct. 1957).

the date the claim is filed.  This is because it is the application of the five-step process that the regulatory change is directed toward, not the substantive basis for disability eligibility.   In other words, the regulatory change had no retroactive effect because the presumption defined by the listing is a rule of adjudication and therefore has its effect on claims at the time of adjudication.

The October 1999 listing did not operate retroactively here because, as part of step three in the sequential evaluation process, it regulated only the process of adjudicating social security disability benefits claims—i.e., adjudicatory conduct—and the adjudicatory conduct regulated here took place years after these listings went into effect when Combs' claim was finally adjudicated by the SSA.

The entire five-step sequential evaluation process has been designed to regulate adjudicatory conduct for the purpose of making adjudication of claims efficient and flexible.  Step three regulates a narrow category of adjudicatory conduct, also to promote adjudicatory efficiency.  *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).  Step three governs the organization of evaluation of proof of listed impairments that, if supplied, renders entitlement to benefits a foregone conclusion.  *See id.* (noting that step "three *streamlines the decision process* by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background.") (emphasis added); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (observing that the regulations "set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard").  Step three effectively allows the SSA to skip the extensive and costly factual inquiry of steps four and five in obvious cases.  *See Yuckert*, 482 U.S. at 153.  As a tool for efficient and organized administrative adjudication, step three regulates the orderly evaluation and presentation of proof of listed impairments.  Changes to these listings consequently have their effect on benefits applications when claimants reach step three in the process of adjudicating their claims.

A rule regulating the evaluation and presentation of proof does not normally operate retroactively if it is applied to pending cases.  The SSA may freely change rules that purely govern the conduct of adjudication, without fear of retroactive effect, if those changes apply only to pending cases.  Naturally, if the SSA had attempted to retry cases that had been adjudicated previously, that might be a different story.  But that did not happen here.  The application of the October 1999 listing to Combs' claim was prospective.

Our upholding of the application of the revised listing to pending applications is supported by the unpublished opinion, albeit cursory in this regard, of the Seventh Circuit in *Barthelemy v. Barnhart*, 107 Fed. Appx. 689, 693 (7th Cir. 2004).

We recognize that several district court cases and one unpublished circuit court opinion have stated or assumed that applying the October 1999 listing to pending claims has an impermissibly retroactive effect.  *Nash v. Apfel*, No. 99-7109, 2000 U.S. App. LEXIS 12030 (10th Cir. June 1, 2000); *Cherry v. Barnhart*, 327 F. Supp. 2d 1347 (N.D. Okla. 2004); *Portlock v. Barnhart*, 208 F. Supp. 2d 451 (D. Del. 2002); *Kokal v. Massanari*, 163 F. Supp. 2d 1122 (N.D. Cal. 2001).  The reasoning of these cases is not compelling.

The Tenth Circuit's opinion in *Nash* is not compelling for several reasons.  The unpublished opinion devotes several sentences to the requirement that the SSA regulations not be retroactive, but assumes without explanation that the change in the listing is impermissibly retroactive.  *See* 2000 U.S. App. LEXIS 12030, at *4-*6.  There is no discussion of what past event the change in the regulation relates to, for purposes of drawing the *Landgraf-Altmann* distinction.  Moreover, in *Nash* the old listing had not been repealed at the time of the agency adjudication, and was only repealed during the pendency of judicial review.  *See id.*  In addition, the Tenth Circuit upheld the denial of

disability even under the old listing, thus further lessening any precedential weight of the Tenth Circuit opinion. *See id.* at *8-*10.

*Kokal* and *Portlock*, two district court opinions, rely upon the assertion that "Plaintiff's rights would be substantively altered if the revision to 20 C.F.R. pt. 404, subpt. P, app. 1 [deleting listing 9.09] was deemed applicable to pending claims, because the revised regulation would raise the bar on proof of disability based on obesity." *Kokal*, 163 F. Supp. 2d at 1131; *see also Portlock*, 208 F. Supp. 2d at 461-62 (following *Kokal*). While deletion of listing 9.09 indeed requires more detailed proof with respect to obese claimants, that fact as explained above does not establish that their rights have been "substantively altered." The SSA deleted listing 9.09 precisely because some clearly non-disabled obese claimants were getting benefits to which they were not entitled. *See* 64 Fed. Reg. at 46125. By reducing the number of erroneous benefits awards to non-disabled people, the SSA has restricted no actual substantive rights.

The actual substantive right to benefits derives from the Act's definition of disability, not step three. Combs does not argue that deleting listing 9.09 created a conflict between the Act's definition of disability and the sequential evaluation process. Such a conflict might result if deleting listing 9.09 truly altered claimants' substantive rights to benefits, but instead it provides a more accurate way of determining the substantive right to benefits resulting from obesity. For this reason, *Kokal* and *Portlock* are not persuasive.

In harmony with *Kokal*, the district court in *Cherry* concluded that applying the October 1999 listing to pending claims has a retroactive effect on claimants who filed their claims before the new listing became effective. 327 F. Supp. 2d at 1358-59. The *Cherry* court said that the past "act" to which the changed listing attached new legal consequences "is the filing of a claim." *Id.* at 1358. The *Cherry* court identified no new legal consequences that the October 1999 listing attached to the "act" of filing a claim. A change in step three requiring more detailed proof simply does not attach new legal consequences to the act of filing a claim.

The application of the revised listing to claims filed before the change is accordingly not retroactive in a way that would make the regulation beyond the authorized rulemaking power of the Commissioner.[3]

_____

[3]The opinion of the D.C. Circuit in *National Mining Association v. Department of Labor*, does not compel a different result. That case held that an administratively promulgated regulation creating a rebuttable presumption in favor of claimants seeking black lung benefits could not be applied to pending cases due to its impermissibly retroactive effect. *See* 292 F.23 849, 865 (D.C. Cir. 2002) (per curiam). The presumption operates retroactively because it "changes the outcome for cases that have already been filed in the Sixth Circuit and any other circuit that would have rejected" the presumption but for the regulation. *See id.* "Our holding," the *National Mining* court concluded, "prevents the Secretary [of Labor] from imposing the presumption, in the form of a new regulation, on all of the other circuits for cases that were *filed* before the regulations were promulgated." *Id.* (emphasis added).

First, the *National Mining* opinion applied the old presumption only to claims filed before the change, and explicitly rejected the possibility of applying the old presumption to claims filed after the effective date, *id.* at 861, notwithstanding any prior decisions regarding the purchase of insurance. Thus, the case cannot reasonably be read to require non-retroactivity of regulatory changes on a theory of reliance-based planning. *See* note 1, *supra*.

Second, the standard applied by the D.C. Circuit in *National Mining* court is not supported by either Supreme Court or Sixth Circuit precedent. The *National Mining* court held that "where a rule changes the law in a way that adversely affects [a party's] prospects for success on the merits of the claim, it may operate retroactively even if designated procedural by the Secretary." *Nat'l Mining*, 292 F.3d at 860 (internal quotation marks omitted). The Supreme Court has never articulated such a standard, nor has this court. The change in the Foreign Sovereign Immunities Act adversely affected Austria's prospects for success in *Altmann*, and the statutory change in *Patel* adversely affected the Patels' prospects for success. Yet neither provision was impermissibly retroactive.

Third, notwithstanding *National Mining*, this court in a subsequent unpublished case has already applied the

Finally, the district court correctly held that the record as a whole contains substantial evidence supporting the second ALJ's denial of Combs' benefits claim. Combs argues, however, that the ALJ gave too little force to the reports of Combs' primary treating specialist, Dr. James Templin, and was too trusting of "non-examining state agency physicians" whose reports date back to 1996 and 1997.

The ALJ stated, "[u]pon reviewing all of the evidence of the record, the undersigned Administrative Law Judge concludes that claimant is not disabled within the meaning of the Social Security Act." Admin. R. at 22. The ALJ found that Combs still had the residual functional capacity to perform light and sedentary work, her impairments notwithstanding. *See* Admin. R. at 26, 27. The ALJ based much of his decision on the 2001 ALJ's recitation of the medical evidence, *see* Admin. R. at 23, which relied on the examinations and opinions of Dr. Anthony Uy, a state agency physician consultant. *See* Admin. R. at 209-10 (relying on Dr. Uy), 469-76 (Dr. Uy's findings). The ALJ stated that he "substantially concurs with, adopts, and incorporates by reference the recitation of the medical evidence contained in the decision dated September 21, 2001." Admin. R. at 23. The ALJ also noted that Combs had supplied some new evidence of disability.

Dr. Uy found that Combs could lift and carry up to 20 pounds frequently, could stand or walk for up to 6 hours, and could sit without medical limitation. *See* Admin. R. at 474. Dr. Uy also found that Combs was capable of climbing and balancing frequently. *See* Admin. R. at 475. When the ALJ incorporated the 2001 ALJ's recitation of the evidence, he incorporated the 2001 ALJ's rationale discounting Dr. Templin's residual functional capacity determination. *See* Admin. R. at 205-07. In October of 1997, according to the 2001 ALJ, Dr. Templin in effect found that Combs could not perform any gainful work, not even sedentary work. *See* Admin. R. at 206. Specifically, the 2001 ALJ related that Templin precluded Combs from

> *any* lifting and limited standing and walking to two-and-a-half hours total of an eight-hour workday with only 30 minutes uninterrupted. She could only sit a total of four hours and only one hour at any one time. Nor could she *ever* climb, balance, stoop, crouch, kneel or crawl. Reaching and handling were affected and [Templin] precluded [Combs] from pushing and pulling on an incline or over rough terrain. . . . [Templin also] restrict[ed] her from working in humidity or with vibration.

Admin. R. at 206 (emphasis in original). By virtue of his incorporation of the 2001 ALJ's recitation of the evidence into his own determination, the ALJ agreed with the 2001 ALJ that others of Dr. Templin's many medical assessments of Combs were inconsistent with this assessment, and that Dr. Templin was therefore less than credible. *See* Admin. R. at 206. For example, the 2001 ALJ noted that in other residual functional capacity assessments in 1999 and 2000, Dr. Templin said that Combs *could* lift or carry up to 20 pounds. *See* Admin R. at 206 (2001 ALJ's comments), 434 (Templin report dated July 22, 2000), 461 (Templin report dated January 6, 1999). The 2001 ALJ noted further that although Dr. Templin had said that Combs should not sit for more than one hour at a time, Combs "nonetheless engages in such sedentary activities as 'spend[ing] the day' watching television." Admin. R. at 206 n.5. The 2001 ALJ also noted that Dr. Templin's medical assessments "do not withstand the test of objective and clinical findings." Admin. R. at 207.

At step five of the sequential evaluation process, the ALJ relied on expert testimony and concluded that Combs could perform a significant number of jobs in the economy. *See* Admin R. at 26-27; *Born v. Sec'y of Health and Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990). In a 1999

---

black lung presumption to pending cases and acknowledged that Sixth Circuit case law inconsistent with the presumption was thereby superseded. *See Glen Coal Co. v. Dir., Office of Workers' Compensation Programs, U.S. Dep't of Labor*, 77 Fed. Appx. 878, 883-84 (6th Cir. 2003). Although *Glen Coal* did not explicitly consider retroactivity issues, it nevertheless applied the presumption to a pending case. *See id.*

hearing vocational expert testimony indicated that a hypothetical person with Combs' characteristics could do light or sedentary work as an information clerk, general office clerk, or security monitor. *See* Admin R. at 90-91. In a 2001 hearing, a vocational expert stated that someone with attributes like Combs' could work as a service station attendant or cafeteria attendant. Admin. R. at 116-17. In a 2003 hearing, a vocational expert testified that a hypothetical person like Combs could work as an assembler of parts and components, and as a weigher, measurer, and inspector. Admin. R. at 162. Based on such testimony, the ALJ found that Combs' impairments permitted her "to perform a significant range of light work." Admin. R. at 25, 27. The ALJ concluded that Combs was not under a disability as defined in the Act. *See* Admin R. at 28.

Combs objects mainly to the ALJ's discounting of Dr. Templin's residual functional capacity determination and his crediting of Dr. Uy's assessment. Given the lack of objective evidence of disability in Dr. Templin's reports and the ALJ's other observations, the ALJ could discount his opinion. As we held in *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993), a social security ALJ may properly discount a treating physician's opinion of disability: "[t]his court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence."

There is substantial evidence in the record as a whole to support the ALJ's determination that Combs is not disabled.

For the foregoing reasons, the district court's judgment is affirmed.

---

**CONCURRENCE**

---

RONALD LEE GILMAN, Circuit Judge, concurring in the judgment. "Any test of retroactivity," the Supreme Court has acknowledged, "will leave room for disagreement in hard cases." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994). As the four opinions produced today demonstrate, this is such a case. The case is made even more unique by the lengthy administrative proceedings required to adjudicate Barbara Combs's application for disability benefits. Had her claim been decided in the normal course, the process would have ended before the rule change, and there would have been no controversy over which rule to apply.

As luck would have it, however, the rule as applied to Combs's claim did change in the middle of the game. The Commissioner's decision to apply the new rule has prompted my colleagues, almost seven years after that change, to spar at length over whether it was substantive or procedural in nature. Of the two positions articulated on that issue, I find Judge Clay's dissent and Judge Griffin's separate opinion more persuasive than the lead opinion in explaining why a shift in the burden of proof, or analogous changes that directly affect a party's prospects for success on the merits, are substantive rather than procedural. In particular, I find both persuasive and apposite the D.C. Circuit's decision in *National Mining Association v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002) (per curiam), a case that counsel for the Commissioner was unable to distinguish at oral argument and that the lead opinion unconvincingly attempts to explain away. Lead Op. at 9 n.3.

I also believe, however, that both the lead opinion and the dissent have failed to see the forest for the trees by allowing these labels—substantive and procedural—to dictate the outcome of this appeal. *See* Lead Op. at 7 ("The substantive requirements for disability eligibility have not changed, only the way in which the agency goes about determining whether they are present."); Dissent at 29 ("Because the deletion of Listing 9.09 was a substantive change, our analysis should be concluded[.]"). The Supreme Court has cautioned against basing a finding that a particular change in the law operates retrospectively on the particular label attached to that change. *See Martin v. Hadix*, 527 U.S. 343, 359 (1999) ("When determining whether a new statute operates retroactively, it is not enough to attach a label (*e.g.*, "procedural," "collateral") to the statute[.]").

Heeding that warning, I cannot agree with the dissent that applying the new rule to Combs's application is impermissibly retroactive simply because the legal change is more substantive than procedural in nature. Nor do I find persuasive the argument that Combs "planned for the possibility of becoming disabled in reliance on the disability benefits scheme available at the time," or that "her disability planning would have been significantly different" had she known about possible changes in the rules. Dissent at 31-32.

At the same time, I remain unconvinced by key aspects of the lead opinion, including its reliance on *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), and its conclusion that the relevant date for retroactivity purposes is "the time of adjudication." *See* Lead Op. at 8. I find more compelling the decision in *National Mining Association*, 292 F.3d at 860, where the D.C. Circuit considered the relevant date to be the date when the miners' disability claims were filed. The lead opinion also minimizes the impact of deleting the obesity listing by coining a new phrase, "adjudicatory conduct," which it says is all that the regulatory change affected. Lead Op. at 8. Although I do not understand the lead opinion to be carving out an entire category of agency activity immune from retroactivity concerns, I still cannot join the lead opinion in creating a new concept whose scope and significance are unclear. Finally, for the reasons explained in Judge Clay's dissent,

I do not believe that the remedy proposed by Judge Griffin in his separate opinion is viable under the governing Social Security regulations.  Dissent at 30 n.5.

I am thus left with the Supreme Court's general guidance from *Landgraf*.  There, the Court cited with approval Justice Story's description of an impermissibly retroactive statute as one that "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability."  *Landgraf*, 511 U.S. at 269 (citations and quotation marks omitted); *id.* at 280 (explaining that a court deciding a retroactivity question must ask whether applying the new statute or regulation "would impair rights a party possessed when he acted, increase his liability for past conduct, or impose new duties with respect to transactions already completed").  Deciding whether "a statute operates 'retroactively' is not always a simple or mechanical task," the Court advised, and courts should make the retroactivity determination by taking into account "familiar considerations of fair notice, reasonable reliance, and settled expectations."  *Id.* at 268, 270.

I concur in the judgment affirming the decision below principally because I am not convinced that applying the new rule to Combs's claims for benefits impaired any "vested right" that Combs may have had, increased her liability "for past conduct," or "impose[d] new duties" on her with respect to a completed transaction.  *See id.* at 269, 280 (citation and quotation marks omitted).  The First Circuit, under similar circumstances, held that "the mere filing of an application is not the kind of completed transaction in which a party could fairly expect stability of the relevant laws as of the transaction date."  *Pine Tree Med. Assocs. v. Sec. of Health and Human Servs.*, 127 F.3d 118, 121 (1st Cir. 1997).  In *Pine Tree Medical Associates*, the plaintiff, a provider of healthcare services, requested that a government agency designate a town as a "medically underserved population," or MUP.  *Id.* at 120.  Healthcare providers that serve MUPs may be eligible "for substantial, cost-based reimbursement under Medicare and Medicare programs."  *Id.*  The agency altered the guidelines used to make the MUP determination after the provider had submitted an application but before the agency had ruled on the application. Using the new guidelines to evaluate the provider's request, the agency then denied the application.  *Id.*

The First Circuit found no retroactivity problem with the use of the new guidelines, squarely rejecting "the proposition that filing an application with an agency essentially fixes an entitlement to the application of those *substantive* regulations in force on the filing date."  *Id.* at 122 (emphasis in original).  I would follow this reasoning and reject Combs's retroactivity challenge on the ground that she had no settled expectation—let alone a vested right—in the use of the "substantive regulations in force" when she filed her disability claim.  *See id.*  The fact that the change may have been fatal to the success of her claim does not alter the conclusion that Combs had no right to expect that filing an application would freeze the law in its then-current state.

In my view, there is a faint yet discernible line that separates *Pine Tree Medical Associates* and the present case on the one hand from cases like *Landgraf* and *National Mining Association* on the other.  That line is the one between (1) applying a new statute or regulation that might deny an applicant benefits being sought from a governmental body, and (2) applying a new statute or regulation that imposes liability on a private party that the party would not have incurred under existing law.  Thus, the Supreme Court in *Landgraf* held that a statutory provision awarding compensatory damages could not be applied "to events antedating its enactment."  511 U.S. at 283.  The Court reasoned that such damages "affect[ed] the liabilities of defendants" for past conduct and constituted "the type of legal change that would have an impact on private parties' planning."  *Id.* at 282.

Similarly, the D.C. Circuit in *National Mining Association* declared impermissibly retroactive one regulation that created a rebuttable presumption in favor of the applicant and another that expanded the scope of the employers' liability "by making more dependents and survivors

eligible for benefits." 292 F.3d at 865-868. The former regulation increased the likelihood that mining companies would be held liable for past conduct, whereas the latter altered the amount that the companies would be required to pay in the event that they were found liable. *See id.* Like the statutory provisions at issue in *Landgraf*, therefore, the regulations both increased the mining companies' potential liability for past conduct and impacted the companies' planning by altering the cost/benefit calculus of operators and insurers. To put the issue in *Landgraf*'s parlance, the regulations "attache[d] new legal consequences to events completed before [their] enactment." 511 U.S. at 270.

In both *Pine Tree Medical Associates* and in the present case, in contrast, the change in the administrative regulations did not impose any kind of liability on either the healthcare provider or Combs, respectively. What the healthcare provider lost was a more favorable regulatory scheme that might have increased its chances of securing reimbursement, just as Combs lost a provision that might have entitled her to a conclusive finding of disability. Both of these parties, in other words, saw a more favorable regulation replaced with one that, while still permitting them to prove their entitlement to the requested funds, made their eventual success less likely. Awareness that the law might change during the application process, however, would not have dissuaded either applicant from seeking the benefits in the first place. That is to say, the possibility of change did not "impact" the "parties' planning." *Landgraf*, 511 U.S. at 282.

I also do not believe that the rule change in the present case, or the one in *Pine Tree Medical Associates*, "attache[d] new legal consequences" to completed events. *See id.* at 270. The applications for prospective governmental benefits in these cases simply do not constitute "completed events" that engender any justifiable reliance on then-existing regulations. When Combs sought disability benefits, and when Pine Tree sought MUP status, the "legal consequence" of applying was either the grant or denial of the requested benefit. After the change in the law, the legal consequences remained exactly the same—the applicant either received or was denied the sought-after benefit. This stands in clear contrast to the examples of *Landgraf* (having to pay compensatory damages for past acts of discrimination) and *National Mining Association* (having to pay a larger number of beneficiaries), where the companies faced new kinds of liabilities for conduct undertaken before the passage of the laws at issue.

I recognize that the line that I have drawn is not perfect and that, like all such lines in the retroactivity context, it is susceptible to breaking down in extreme cases. *See Landgraf*, 511 U.S. at 270 (noting that "[a]ny test of retroactivity . . . is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity"). One can imagine a scenario where an applicant for disability benefits organizes her proof around a controlling regulation, the administrative hearing is conducted pursuant to that regulation, and then the regulation changes before a decision is issued solely because the ALJ is a particularly slow drafter. Under those circumstances, the applicant may well have a "settled expectation" in an administrative decision rendered pursuant to the former regulation. But the present case, although difficult, does not raise the more complicated issues that might arise from an agency's unreasonable and/or deliberate delay in resolving an application.

In sum, I agree with the lead opinion that the "familiar considerations of fair notice, reasonable reliance, and settled expectations" cut against finding that the application of the new obesity standard to Combs's case was impermissibly retroactive. *See Landgraf*, 511 U.S. at 270; Lead Op. at 5-6 & n.1. Combs could not have had a "settled expectation" that the law would remain the same indefinitely, since almost every change in the law—as the Court has noted—is detrimental to some person's interests. *See Landgraf*, 511 U.S. at 269 n.24 (giving examples of "uncontroversially prospective statutes" that "unsettle expectations and impose burdens on past conduct"). And although Combs undoubtedly relied on the availability of disability benefits when she submitted her application, the rule change did not deprive her of the ability to prove entitlement to those benefits, even if it did make her success less likely. In the end, I cannot say that the fact that

the rule change adversely affected Combs's chances of prevailing converted an otherwise permissible application of the current law into an impermissible one.

This last point—that applying the current law to pending cases is the rule rather than the exception—is the final consideration that informs my resolution of this case. We should not forget that at the heart of *Landgraf* is an attempt to reconcile two general principles of law that seemingly point in opposite directions: (1) that "a court should 'apply the law in effect at the time it renders its decision,'" *id.* at 264 (quoting *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711 (1974)); and (2) that "'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result,'" *id.* (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

As I read *Landgraf*, the Court resolved "the apparent tension" inherent in these principles by instructing that the current law be applied *unless* that law would have an impermissible retroactive effect as that concept is defined by the Court's cases. *Id.* at 264 (citation and quotation marks omitted); *see id.* at 269 (emphasizing that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . .") (citation omitted). That is, application of the current law is the default position from which courts should stray *only* if one of the narrow fairness-based criteria set forth in *Landgraf* is satisfied. *See Patel v. Gonzales*, 432 F.3d 685, 691 (6th Cir. 2005) ("Courts should apply the law in effect at the time of the decision, unless such law has a retroactive effect on the parties.").

I would also note that Combs would hardly be complaining if Listing 9.09 had first come into existence *after* she had filed her application and while her case was still pending. *Cf. United States v. Real Prop. in Section 9, Town 29 North, Range 1 West Township of Charlton*, 241 F.3d 796, 799-800 (6th Cir. 2001) (applying to a pending case a new statute that increased the government's burden of proof in civil forfeiture proceedings). Applying the current law, in other words, leads to consequences that are far from universally negative. In addition to the other reasons set forth above, therefore, I believe that the sound practice of generally applying current law to pending cases tips the balance in favor of the ALJ's decision in the context of this admittedly close case.

Because I do not believe that applying the new obesity standard to Combs's application was impermissibly retroactive, and because substantial evidence in the record supports the decision of the ALJ, I concur in the judgment reached in the lead opinion. I do not, however, agree with key aspects of the lead opinion's analysis and would therefore enter judgment only on the strength of the reasons set forth above.

---

### CONCURRING IN PART, DISSENTING IN PART

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part. I concur in the result of the plurality's opinion for the claimed disability period post-October 25, 1999. However, I respectfully dissent from the denial of plaintiff's claim for disability benefits for the period of May 30, 1996, through October 25, 1999. Regarding this portion of plaintiff's claim arising prior to the repeal of Listing 9.09, I would remand for a new hearing with instructions to apply 9.09 to the closed period.

I.

Title 42 U.S.C. § 405(a) provides the Commissioner of Social Security ("the Commissioner") with the authority to make reasonable rules and regulations that are consistent with the provisions of the U.S. Social Security Act. However, as the Supreme Court cautioned in *Bowen v. Georgetown Hospital*, 488 U.S. 204 (1988), § 405(a) "contain[s] no express authorization of retroactive rulemaking[,]" *id.* at 213. Although the parties recognize the precedential effect of *Bowen*, they disagree on what constitutes retroactive rulemaking. The Commissioner contends that application of the rule change to Combs' claims does not have an impermissible "retroactive effect" because it does not impair any of her substantive or vested rights. The Commissioner argues that the regulation repeal is purely procedural and, therefore, does not affect plaintiff's substantive rights. I disagree.

In *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994), the Supreme Court addressed the issue of retroactivity with respect to statutes. There, the Court adopted a presumption against retroactivity because prospectivity "accords with widely held intuitions about how statutes ordinarily operate" and "will generally coincide with legislative and public expectations." *Id.* at 272. The Court noted, however, that exceptions exist to the general rule favoring prospectivity. As a result, to analyze retroactivity, the Court set forth the following framework: (1) whether the statute on its face provides for prospective or retroactive application; (2) in the absence of such an express provision governing the statute's reach, whether the statute would have retroactive effect; and (3) if the statute would have retroactive effect, whether Congress clearly intended such a retroactive effect, overcoming the presumption of prospectivity.[1] *Id.* at 280.

The second step of the *Landgraf* analysis requires a determination of whether application of the Revised Medical Criteria would have "retroactive" effect. 511 U.S. at 280; *see Portlock v. Barnhart*, 208 F. Supp. 2d 451, 461 (D. Del. 2002) ("The starting point for the court's analysis is to determine whether applying the revised regulations in the manner urged by the SSA in SSR 00-3p would constitute a retroactive application of a rule."). Black's Law Dictionary defines the term "retroactive" as that which extends a statute or regulation "in scope or effect to matters that have occurred in the past." BLACK'S LAW DICTIONARY 1343 (8th ed. 2004). A regulation therefore has "retroactive effect" if it "impair[s] the rights the party had when he acted, increase[s] a party's liability for past conduct or impose[s] new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. *See also Fernandez-Vargas v. Gonzales*, 548 U.S. —, 126 S. Ct. 2422, 2427-28, 165 L.Ed.2d — (2006).

---

[1] Although *Landgraf* addressed the retroactive application of *statutes*, courts have applied its reasoning to the issue of retroactivity of *regulations*. *See Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 838 (9th Cir. 1997); *see also Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala*, 994 F. Supp. 950, 960 (N.D. Ill. 1998) (noting *Landgraf* "supplies the test to decide when a statute (or by natural extension a regulation) operates retroactively").

In this case, several courts have agreed that application of the Revised Medical Criteria to a claimant with a claim pending when Listing 9.09 was deleted would have a "retroactive effect." *Nash v. Apfel*, No. 99-7109, 2000 U.S. App. LEXIS 12030, \*\*5-6 (10th Cir. June 1, 2000) (unpublished); *see, e.g.*, *Portlock*, 208 F. Supp. 2d at 461 ("[T]he application of the revised listings to [claimant's] claim would constitute a retroactive application of the rule."); *Kokal v. Massanari*, 163 F. Supp. 2d 1122, 1131 (N.D. Cal. 2001) (holding new listing substantively alters a claimant's rights); *Cherry v. Barnhart*, 327 F. Supp. 2d 1347, 1359 (N.D. Okla. 2004) (noting deletion of Listing 9.09 "clearly alters the standard for evaluating disability claims"), *aff'd*, 125 F. App'x 913 (10th Cir. 2005) (unpublished).[2] The logic of the forgoing cases is sound; indeed, the administrative record reflects that Combs likely meets the requirements of Listing 9.09, yet does not meet the disability parameters outlined by the Revised Medical Criteria. *Cf. Landgraf*, 511 U.S. at 280 (noting retroactive effect arises when statute or regulation "impair[s] rights possessed when [claimant] acted . . . and impose[s] new duties with respect to transactions already completed"). Thus, "Plaintiff's rights would be substantively altered if the revision to 20 C.F.R. pt. 404, subpt. P, app. 1 was deemed applicable . . . , because the revised regulation would raise the bar on proof of disability based on obesity." *Kokal*, 163 F. Supp. 2d at 1131. Accordingly, application of the Revised Medical Criteria to Combs would have a "retroactive effect."

The Commissioner argues that "[t]he agency's rules here are akin to procedural rules that the Court has previously found not to be retroactive." Burdens of proof, however, are substantive law, not procedural rules. *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959) (citation omitted); *Blue Diamond Coal Co. v. United Mine Workers of Am.*, 436 F.2d 551, 563 (6th Cir. 1970) (observing that "where the burden of proof lies is a matter of substantive law" (citing *Cent. Vt. Ry. Co. v. White*, 238 U.S. 507, 511-12 (1915)).

Moreover, other courts have previously rejected similar arguments from the Commissioner. The *Cherry* court, for example, noted that "[t]he Supreme Court emphasized in *Landgraf* that the presumption against retroactivity is not restricted to cases involving contractual or property rights or 'vested rights.'" 327 F. Supp. 2d at 1359 (citing *Landgraf*, 511 U.S. at 275 n.29). Additionally, the *Landgraf* Court expressly noted, contrary to the Commissioner's arguments, that retroactivity concerns may arise in the context of so-called "procedural rules." *Landgraf*, 511 U.S. at 275 n.29; *accord Ibrahim v. District of Columbia*, 208 F.3d 1032, 1036 (D.C. Cir. 2000) (observing that where a rule "changes the law in a way that adversely affects [a party's] prospects for success on the merits of the claim," it may operate retroactively even if designated as "procedural" by the Commissioner). Accordingly, I conclude that the "procedural" label assigned to the Revised Medical Criteria by the Commissioner is meaningless.

## II.

Next, the parties dispute the date upon which retroactivity should be determined. Combs argues that whether the repeal of Listing 9.09 is retroactive should be measured from November 4, 1996, the date that Combs filed her application for benefits. On the other hand, the Commissioner asserts, and the plurality agrees, that retroactivity should be determined by reference to the date of the adjudication of Combs' claim for benefits; i.e., January or February 2003.[3] I disagree and would

---

[2] *See also, e.g., Ingram v. Barnhart*, 303 F.3d 890, 894-95 (8th Cir. 2002); *Branson v. Barnhart*, No. 01-1372, 2005 U.S. Dist. LEXIS 36945, \*\*8-9 (E.D. Pa. Dec. 29, 2005); *Rogers v. Barnhart*, No. 01-CV-4428, 2003 U.S. Dist. LEXIS 18152, \*8 n.3 (E.D. Pa. Sept. 17, 2003).

[3] The most recent adjudication commenced in January 2003 and concluded with a decision rendered by the administrative law judge on February 21, 2003. It is not clear whether the "date of adjudication" argued by defendant and accepted by the plurality is the date the adjudication commenced or concluded. Although it makes no difference in the present case, it may be outcome determinative in other cases.

hold that retroactivity should be determined by a third date – October 25, 1999 – the date upon which the regulation change became effective.

In my view, because a final determination of disability has never been made in this case due to the numerous appeals and convoluted procedural history, I would remand for a new hearing. For purposes of the hearing, I would afford Combs the benefit of Listing 9.09 for the claimed disability period of May 30, 1996, until the effective date of its repeal, October 25, 1999. In regard to the claimed disability period post-October 25, 1999, I would affirm the denial of disability benefits on the basis that the ALJ's findings of fact for the period after the effective date of the repeal were supported by substantial evidence. 42 U.S.C. § 405(g); *Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005).

At oral argument, the Commissioner argued that bifurcating plaintiff's disability claims into the periods of pre- and post-regulation repeal would be unduly burdensome and may violate 42 U.S.C. § 423(f) of the Act. I disagree with both propositions. First, because retroactive rulemaking is prohibited by law, the Commissioner is not permitted to impose rules retroactively simply as a matter of convenience. *See Bowen*, 488 U.S. at 213 ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). Regardless of the Commissioner's assertion of an increased administrative burden, it is axiomatic that the Commissioner must apply new regulations prospectively, only. *Id.* (holding that § 405(a) specifically "contain[s] no express authorization of retroactive rulemaking"). If such action leads to bifurcation of claims, then bifurcation is required by the law.

As to the second argument, the text of 42 U.S.C. § 423 does not address the date that retroactivity should be determined. Rather, § 423(f) provides that a "*recipient of benefits*" may not have benefits terminated unless substantial evidence demonstrates a change in the medical condition or in the individual's ability to engage in substantial, gainful employment:

> *A recipient of benefits* under this title [42 U.S.C. §§ 401-434] or title XVIII [42 U.S.C. §§ 1395-1395hhh] based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by –
>
> (1)    substantial evidence which demonstrates that –
>
> (A)    there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
>
> (B)    the individual is now able to engage in substantial gainful activity; or
>
> (2)    substantial evidence which –
>
> (A)    consists of new medical evidence and a new assessment of the individual's residual functional capacity, and demonstrates that –
>
> (i)    although the individual has not improved medically, he or she is nonetheless a beneficiary of advances in medical or vocational therapy or technology (related to the individual's ability to work), and
>
> (ii)    the individual is now able to engage in substantial gainful activity, or
>
> (B)    demonstrates that –

(i)        although the individual has not improved medically, he or she has undergone vocational therapy (related to the individual's ability to work), and

(ii)        the individual is now able to engage in substantial gainful activity; or

(3)        substantial evidence which demonstrates that, as determined on the basis of new or improved diagnostic techniques or evaluations, the individual's impairment or combination of impairments is not as disabling as it was considered to be at the time of the most recent prior decision that he or she was under a disability or continued to be under a disability, and that therefore the individual is able to engage in substantial gainful activity; or

(4)        substantial evidence (which may be evidence on the record at the time any prior determination of the entitlement to benefits based on disability was made, or newly obtained evidence which relates to that determination) which demonstrates that a prior determination was in error.

42 U.S.C. § 423(f) (emphasis added).

In the present case, this statutory provision is not applicable because, as a result of numerous appeals, there has not been a final determination and Combs has not received benefits. By its terms, the plain language of § 423(f) does not apply to Combs' pending claim for benefits. *See Hartford Underwriters Ins. Co. v Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms."). Because Combs has never received benefits, she is not a "recipient of benefits." Rather, she is, and always has been, a mere *claimant* for benefits for whom 42 U.S.C. § 423(f) is not applicable.

20 C.F.R. 404.989, which defines good cause for the reopening of a decision, is also inapplicable:

We will not find good cause to reopen your case if the only reason for reopening is a change of legal interpretation or administrative ruling upon which the determination or decision was made.

Again, however, because there has not been a final disposition of Combs' disability claim, the reopening of a prior decision is not at issue. The same is true with Social Security Ruling, SSR 02-10p, regarding "periodic continuing disability review" of previously awarded disability benefits.

In summary, the parties have poorly postured this case as an all or nothing proposition. To avoid the prohibition against retroactive rulemaking, Combs asks this court to hold that the determinative date for purposes of retroactivity is the date on which the claim is filed, while defendant argues that this court should base any retroactivity analysis on the date of adjudication. I disagree with both positions and would hold that the operative date for purposes of retroactivity is the effective date that the regulation was changed.

Although disability insurance benefits are determined "for *each month* [claimed] beginning with the first month after his waiting period, . . ." 42 U.S.C. §423(a)(D) (emphasis added), the ALJ failed to apply the conclusive presumptions of obesity disability specified by Listing 9.09 for

plaintiff's month-by-month claims for the period of May 30, 1996, to October 25, 1999.[4] By instead applying the Revised Medical Criteria to Combs' disability claim, the ALJ engaged in the application of retroactive rulemaking. Accordingly, I would remand for a new hearing and a determination of whether plaintiff is entitled to disability benefits for the closed period of May 30, 1996, through October 25, 1999. With regard to the denial of benefits thereafter, I would affirm.

III.

For these reasons, I respectfully concur in part and dissent in part.

---

[4]Fluctuation in weight is one of the most fluid of all physical conditions. Combs may have been disabled for some, but not all, of the months claimed. Apparently, the dissent would order a determination of her claimed disability on the date of her application, only.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, with whom MARTIN, DAUGHTREY, MOORE, and COLE, Circuit Judges, join, dissenting. In finding that the application of newly promulgated obesity rules did not have an impermissible retroactive effect on Plaintiff with respect to her pending application for Social Security disability benefits, the lead opinion seriously misapprehends and oversimplifies the Supreme Court's retroactivity jurisprudence. At its core, the lead opinion asserts two positions: (1) the shift from Listing 9.09 to the new obesity rules was merely a procedural change that did not have an impermissible retroactive effect; and (2) Plaintiff did not rely on Listing 9.09 in becoming disabled. These positions are incorrect and irrelevant, respectively. I therefore respectfully dissent.

I.

Plaintiff is a former seamstress and daycare employee. Plaintiff claims that as of May 30, 1996, she was disabled due to morbid obesity, fibromyalgia, degenerative disc disease of the lumbosacral spine, degenerative arthritis bilateral knees, and other severe physical ailments, as well as depression. Plaintiff filed an application for disability benefits on November 4, 1996. After an initial denial of her application, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On January 26, 1998, the ALJ denied the request. On October 23, 1998, the appeals council vacated the decision of the ALJ and granted Plaintiff a hearing. In February 1999, over two years after Plaintiff's initial application, the ALJ held a hearing and then subsequently denied Plaintiff's application.

The appeals council vacated the decision of the ALJ and remanded Plaintiff's case on the ground that the ALJ failed to properly analyze Plaintiff's impairments. On September 21, 2001, on remand, the ALJ again denied Plaintiff's application. The appeals council again vacated the decision of the ALJ and remanded Plaintiff's case on the grounds that the ALJ failed to properly analyze Plaintiff's impairments and the ALJ incorrectly analyzed Plaintiff's credibility. The case was remanded to another ALJ, who in February 2003 denied Plaintiff's application as well. The appeals council declined to reverse this decision.

When Plaintiff filed her application for disability benefits in 1996, Listing 9.09 was in effect. That listing stated that an applicant who met a certain weight/height combination so as to demonstrate morbid obesity and who also suffered from an additional, specific impairment would be presumed to be disabled and would be entitled to disability benefits.[1] Listing 9.09 was still in

———————————

[1]Former Listing 9.09 stated:

**9.09 Obesity.** Weight equal to or greater than the values specified in Table I for males, Table II for females (100 percent above desired level), and one of the following:

A) History of pain and limitation of motion in any weight-bearing joint or the lumbrosacral spine . . . associated with findings on medically acceptable imaging techniques of arthritis in the affected joint or lumbrosacral spine; or

B) Hypertension with diastolic blood pressure persistently in excess of 100 mm. Hg measured with appropriate size cuff; or

C) History of congestive heart failure manifested by past evidence of vascular congestion such as heptomegaly, peripheral or pulmonary edema; or

D) Chronic venous insufficiency with superficial varicosities in a lower extremity with pain on weight bearing and

effect in February 1999, when the ALJ erroneously analyzed Plaintiff's impairments and denied Plaintiff's application. From the record, it is clear that Plaintiff had a strong case for presumptive disability under Listing 9.09. At the first hearing, had the ALJ correctly analyzed Plaintiff's impairments, he most likely would have found Plaintiff to be disabled. The Social Security Administration ("SSA") deleted Listing 9.09 on August 24, 1999, almost three years after Plaintiff applied for disability benefits. The final, binding decision of the ALJ did not occur until February 2003, so that Plaintiff could not employ Listing 9.09 to establish her disability.

II.

The lead opinion expends a scant amount of ink in explaining the nuances of Supreme Court cases pertaining to retroactivity. This lack of exposition is somewhat surprising, when one considers that the Supreme Court has stated that retroactivity analysis does not lend itself to easy application. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994) ("Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity."). Further clarification of certain cases is in order and will assist in illuminating the deficiencies in the lead opinion.

The Supreme Court's current position on retroactivity is best described in *Landgraf v. UFI Film Products*. In that case, the plaintiff was employed by the defendant from 1984 to 1986. *Id.* at 247-48. A fellow employee harassed the plaintiff with inappropriate remarks and physical contact. *Id.* at 248. The plaintiff complained to the defendant's management, and management conducted an investigation, reprimanded the harassing employee, and transferred that employee to another department. *Id.* Four days later, the plaintiff quit. *Id.* The plaintiff filed a charge against the defendant with the Equal Employment Opportunity Commission ("EEOC"), but the EEOC dismissed the charge because it found that while the plaintiff had suffered from a hostile work environment, the defendant had adequately remedied the situation. *Id.* The plaintiff then filed suit in federal district court. *Id.* In a bench trial, the court dismissed the plaintiff's complaint; it found that while the plaintiff had suffered from a hostile work environment, she was not constructively discharged by the defendant. *Id.* The plaintiff appealed.

On November 21, 1991, while the plaintiff's appeal was pending, the President signed into law the Civil Rights Act of 1991. *Id.* at 249. Prior to this legislation, the Civil Rights Act of 1964 only provided for equitable remedies, such as backpay, in cases of discrimination. *Id.* at 252. Under the Civil Rights Act of 1991, however, a person who has suffered from discrimination could also recover compensatory and punitive damages. *Id.* Moreover, a person seeking compensatory and punitive damages is entitled to a jury trial. *Id.*

The plaintiff argued before the court of appeals that the court should remand her case to the district court for a jury trial on the issues of compensatory and punitive damages pursuant to the Civil Rights Act of 1991. *Id.* at 249. The court rejected this argument, reasoning that the Civil Rights Act of 1991 could not be retroactively applied to the defendant, inasmuch as such application would be unjust because it would increase the defendant's liability for conduct that occurred before the enactment of the Civil Rights Act of 1991. *Id.* at 249.

The Supreme Court affirmed. The Court found that the Civil Rights Act of 1991 expanded the potential forms of relief available to a person who has suffered discrimination. *Id.* at 252-54. In addition, the newly enacted legislation increased the scope of actionable conduct; before the 1991

---

persistent edema; or

E) Respiratory disease with total forced vital capacity equal to or less than 2.0 L. or a level of hypoxemia at rest equal to or less than the values specified in Table III-A or III-B or III-C.

Act, the "plaintiff could not recover monetary relief unless the discrimination was also found to have some concrete effect on the plaintiff's employment status, such as a denied promotion, a differential in compensation, or termination." *Id.* at 254. Under the 1991 Act, however, a plaintiff could recover "in circumstances in which there has been unlawful discrimination in the terms, conditions, or privileges of employment, . . . even though the discrimination did not involve a discharge or a loss of pay." *Id.* (internal quotation marks and citation omitted).

The first question the Court addressed was "whether the statutory text on which [the plaintiff] relies manifests an intent that the 1991 Act should be applied to cases that arose and went to trial before its enactment." *Id.* at 257. The Court answered in the negative, finding that the text of the statute was ambiguous as to a congressional intent of retroactive application of the 1991 Act. The Court reasoned, "It is entirely possible–indeed, highly probable–that because it was unable to resolve the retroactivity issue . . ., Congress viewed the matter as an open issue to be resolved by the courts." *Id.* at 261.

Next, the Court addressed whether, despite the lack of clear congressional intent, the 1991 Act could be retroactively applied to the defendant. The Court found that there was a long-established presumption against retroactive legislation: "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at 265. On the other hand, "[r]etroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." *Id.* at 267-68. The Court warned that "deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268. More specifically:

> A statute does not apply "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment . . ., or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges have "sound . . . instinct[s]," . . . and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.* at 269-70 (alteration in the original) (internal citations omitted).

Despite the presumption against retroactivity, the Court "recognized that, in many situations, a court should 'apply the law in effect at the time it renders its decision,' . . . even though that law was enacted after the events that gave rise to the suit." *Id.* at 273 (internal citation omitted). For example, "[w]hen the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* In another example, the Court stated, "We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Id.* at 274.

Importantly for Plaintiff's case, the Court also reasoned that

> [c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity. . . . We [have] noted the

diminished reliance interests in the matter of procedure. . . . Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive.

*Id.* at 275 (internal citations omitted). The Court warned, however, that "[o]f course, the mere fact that a new rule is procedural does not mean that it applies to every pending case. . . . Our orders approving amendments to federal procedural rules reflect the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case." *Id.* at 275 n.29.

The Court offered these final words of guidance:

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280. Armed with these principles, the Court found that application of the 1991 Act would have an impermissible retroactive effect on the conduct of the defendant. Specifically, the Court found that retroactive application of punitive damages would raise serious constitutional concerns with respect to the Ex Post Facto Clause. *Id.* at 281. With respect to compensatory damages, the Court found that "[t]he introduction of a right to compensatory damages is also the type of legal change that would have an impact on private parties' planning. . . . [I]f applied here, [compensatory damages] would attach an important new legal burden to that conduct." *Id.* at 282-83. The Court also found that because the 1991 Act increased the scope of actionable conduct, it created a new cause of action that could not be retroactively applied to the defendant. *Id.* at 283.

In *Martin v. Hadix*, 527 U.S. 343 (1998), the Supreme Court held that a provision of the Prison Litigation Reform Act of 1995 ("PLRA") that limited attorney's fees could not be applied to legal work performed before the PLRA's enactment. Prior to the PLRA, attorneys who worked on behalf of the prisoners in two specific federal cases that addressed prison conditions were entitled to the prevailing market rate, which was $150 per hour at the time the work was performed. *Id.* at 348. Pursuant to the PLRA, however, the rate for prisoner legal work was set with respect to the rate of court-appointed attorneys. *Id.* at 350. As a result, attorneys who worked on behalf of the prisoners were only entitled to $112.50 per hour. *Id.* The issue was whether the PLRA limitation could apply to legal work performed before the enactment of the PLRA but where the fee request was filed after the enactment of the PLRA. *Id.* at 351-53.

The Supreme Court answered in the negative. Under the first step of *Landgraf*, the Court found that Congress had not expressed a clear intent that the PLRA apply to legal work performed prior to the enactment of the PLRA. *Id.* at 357. Under the second step of *Landgraf*, the Court found that application of the PLRA to pre-PLRA legal work would result in an impermissible retroactive effect. The Court reasoned that the attorneys in the case

had a reasonable expectation that work they performed prior to enactment of the PLRA . . . would be compensated at the pre-PLRA rates . . . . [C]ounsel performed

> a specific task . . . and they were told that they would be compensated at a rate of $150 per hour. Thus, when the lawyers . . . provided these . . . services before the enactment of the PLRA, they worked in reasonable reliance on this fee schedule. The PLRA, as applied to work performed before its effective date, would alter the fee arrangement *post hoc* by reducing the rate of compensation. To give effect to the PLRA's fees limitations, after the fact, would "attac[h] new legal consequences" to completed conduct.

*Id.* at 358 (second alteration in the original) (citation omitted).

The Court rejected the respondent's argument that the fee provision of the PLRA was collateral to the main cause of action and therefore was not impermissibly retroactive under *Landgraf*. *Id.* at 358-59. The Court admitted that in *Landgraf*, the Court stated that the question of attorney's fees did not "change the substantive obligations of the parties because they are collateral to the main cause of action." *Id.* at 359 (internal quotation marks and citation omitted). The Court, however, warned about generalizations in the retroactivity analysis:

> While it may be possible to generalize about types of rules that ordinarily will not raise retroactivity concerns, . . . these generalizations do not end the inquiry. For example, in *Landgraf*, we acknowledged that procedural rules may often be applied to pending suits with no retroactivity problems, . . . but we also cautioned that "the mere fact that a new rule is procedural does not mean that it applies to every pending case . . . . We took pains to dispel the "sugges[tion] that concerns about retroactivity have no application to procedural rules." . . . When determining whether a new statute operates retroactively, it is not enough to attach a label (*e.g.*, "procedural," "collateral") to the statute; we must ask whether the statute operates retroactively.

*Id.* (alteration in the original) (internal citations omitted). The Court found that though the attorney fees were "collateral," that label did not preclude a retroactivity analysis. *Id.*

In *Republic of Austria v. Altmann*, the Supreme Court held that the Foreign Sovereign Immunities Act of 1976 ("FSIA") applied to claims based on conduct that occurred prior to the FSIA's enactment. 541 U.S. 677, 700 (2004). The FSIA was a codification of sovereign immunity principles and exempted foreign nations from the jurisdiction of state and federal courts, except in certain specific circumstances. *Id.* at 681. One of these exceptions was when property was taken in violation of international law. *Id.* The plaintiff in that case sued the Republic of Austria and the Austrian Gallery in federal court, alleging that the gallery obtained possession of valuable paintings belonging to her uncle through wrongful conduct that occurred during World War II and the years directly afterward. *Id.* at 680-81. The plaintiff claimed that she was the rightful owner of these paintings according to her uncle's will. *Id.* at 680. The defendants claimed that, at the time when the wrongful conduct occurred, they would have been absolutely immune to suit in federal court. *Id.* at 686. They claimed that application of the FSIA to allow jurisdiction over the case would have an impermissible retroactive effect. *Id.*

The Supreme Court disagreed and held that the district court had jurisdiction to hear the case. The Court first noted that while there was language in the FSIA suggesting that Congress intended the FSIA to apply to preenactment conduct, that language was not so clear so as to be an "expres[s] prescri[ption of] the statute's proper reach." *Id.* at 694 (alterations in the original) (quotation marks omitted). The Court then proceeded to determine whether the statute had an impermissible retroactive effect. The Court found that the FSIA defied categorization as either a substantive or procedural provision. *Id.* at 694. The Court, however, ruled that the presumption against retroactivity did not apply to changes in sovereign immunity, inasmuch as the purpose of sovereign immunity was not so that foreign nations could shape their conduct around such immunity. *Id.* at

696. Instead, sovereign immunity was a "gesture of comity" based on "current political realities and relationships." *Id.* In other words, the underlying rationale for the presumption against retroactivity did not exist in the sovereign immunity context. In bolstering its decision, the Court found that the language of the statute and its structure, while not clear enough to be considered an express command from Congress, strongly suggested that Congress intended the FSIA to reach claims based upon preenactment conduct. *Id.* at 697-99.

III.

The lead opinion asserts that the deletion of Listing 9.09 and the subsequent implementation of new obesity rules constituted procedural, as opposed to substantive, changes, so that Plaintiff did not suffer from an impermissible retroactive effect. Nothing could be further from the truth. As Judge Griffin explains in his separate opinion, and as Judge Gilman agrees in his separate opinion, burdens of proof are substantive, not procedural, law. *See, e.g.*, *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20-21 (2000) ("*Given its importance to the outcome of cases*, we have long held the burden of proof to be a 'substantive' aspect of a claim." (emphasis supplied)); *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 271 (1994) ("But the assignment of the burden of proof is a rule of substantive law . . . ."); *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959) ("[P]resumptions (and their effects) and burden of proof are 'substantive' . . . ."). In the same vein, presumptions, such as that found in Listing 9.09, are substantive law. *See id*; *see also Allentown Mack Sales and Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 378 (1998) (explaining that evidentiary presumptions are "substantive rules of law"). No matter what label the lead opinion attaches, the shift from Listing 9.09 to the new obesity rules was a substantive change in the law, so that application of the new rules had an impermissible retroactive effect on Plaintiff.[2]

Moreover, even without the preceding case law on the substantive nature of burdens of proof and presumptions, the lead opinion's assertion that the change in the SSA's obesity rules was procedural would still be improper. The Supreme Court has repeatedly warned against mechanically labeling a change in law as procedural and therefore not subject to the presumption against retroactivity. *See Martin*, 527 U.S. at 359 ("When determining whether a new statute operates retroactively, it is not enough to attach a label (*e.g.*, 'procedural,' 'collateral') to the statute; we must ask whether the statute operates retroactively."); *Landgraf*, 511 U.S. at 275 n.29. The question then becomes what the proper inquiry should be to determine whether a change in law has an impermissible retroactive effect, without relying on the judicial shortcuts of calling the change "procedural" or "substantive."

The analysis of the D.C. Circuit is persuasive in this regard. In *National Mining Association v. Department of Labor*, the court addressed new rules promulgated by the Department of Health and Human Services ("DHHS") pursuant to the Black Lung Benefits Act ("BLBA"), legislation designed to provide disability benefits to coal miners. 292 F.3d 849, 854-856 (D.C. Cir. 2002). The bulk of these new rules provided procedures that made it easier for coal miners to assert a claim of disability. *Id.* at 855. The DHHS argued that the new rules were only procedural and did not affect substantive rights. The court responded:

---

[2]Contrary to Judge Gilman's contention, this position is not a mere or glib labeling of the change in law as "substantive." The Supreme Court has stated, "Under *Landgraf*, . . . it is *appropriate* to ask whether the Act affects substantive rights (and thus would be impermissibly retroactive if applied to preenactment conduct) or addresses only matters of procedure (and thus may be applied to all pending cases regardless of when the underlying conduct occurred)." *Altmann*, 541 U.S. at 694 (emphasis supplied). Thus, the question of whether the change in law was substantive or procedural is an important one, even though the answer to that question may be clouded by hastily applied labels. In this case, as demonstrated by the preceding citations, the change from Listing 9.09 to the new obesity rules *was* a substantive change, as opposed to being labeled *as* a substantive change.

Rather than rely on "procedural" and "substantive" labels, a court must ask whether the [regulation] operates retroactively. . . . This inquiry involves a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment. Thus, where a rule changes the law in a way that adversely affects [a party's] prospects for success on the merits of the claim, it may operate retroactively even if designated "procedural" by the Secretary.

*Id.* at 859-60 (alterations in the original) (internal quotation marks and citations omitted). A specific example of a seemingly procedural change that the court struck down as impermissibly retroactive was 20 C.F.R. § 725.701. The regulation created

a rebuttable presumption that when a miner who is eligible for black lung benefits receives medical treatment for a pulmonary disorder, the disorder is "caused or aggravated by the miner's pneumoconiosis." 20 C.F.R. § 725.701(e). The employer may rebut the presumption with "credible evidence that the medical service or supply provided was for a pulmonary disorder apart from those previously associated with the miner's disability" or was beyond the treatment necessary to treat the covered disorder, or "was not for a pulmonary disorder at all." *Id.*

*Id.* at 865. Before this new regulation, a miner was required to affirmatively prove that his pulmonary disorder was caused or aggravated by his pneumoconiosis in order to qualify for benefits in the form of payment of the medical expenses in connection with the pulmonary disorder. With the new regulation, the DHHS presumed that the pulmonary disorder was caused or aggravated by the miner's pneumoconiosis and the miner was therefore eligible for benefits. Thus, the miner's employer was more likely to lose a claim under the new regulation where the miner asserted a pulmonary disease. This was the precise situation "where a rule changes the law in a way that adversely affects [a party's] prospects for success on the merits of the claim," *id.* at 860 (internal quotation marks and citation omitted), so that the court found that the new regulation was retroactive and could not be applied to pending cases, *id.* at 865.

The instant case presents almost identical circumstances, except that the burden shift was in the opposite direction. Under Listing 9.09, if Plaintiff met certain criteria, there was an irrebuttable presumption that Plaintiff was disabled and thus entitled to benefits. Under the new obesity rules, Plaintiff must actually prove disability at Step Three, Four, or Five of the SSA's process in order to qualify for benefits. In *Kokal v. Massanari*, a district court viewed the deletion of Listing 9.09 in this manner: "Here, Plaintiff's rights would be substantively altered if the [change in obesity rules] was deemed applicable to pending claims, because the revised regulation would raise the bar on proof of disability based on obesity." 163 F. Supp. 2d 1122, 1131 (N.D. Cal. 2001). As the facts of this case so aptly demonstrate, the new obesity rules adversely affected Plaintiff's prospects for success on the merits. These new rules thus had an impermissible retroactive effect and should not have been applied to Plaintiff's pending application for disability benefits.

Judge Gilman's position that *National Mining Association* is directly on point and persuasive therefore clashes and is irreconcilable with his conclusion that the deletion of Listing 9.09 and the application of the new obesity rules to Plaintiff was not impermissibly retroactive. Under *National Mining Association*, the inquiry is whether "a rule changes the law in a way that adversely affects [a party's] prospects for success on the merits of the claim." *Nat'l Mining Assoc.*, 292 F.3d at 860 (alteration in the original) (internal quotation marks and citation omitted). This inquiry answers whether the change in law is impermissibly retroactive, not whether the change in law is substantive or procedural. *Id.* at 859-60. In this case, it is without question that the change in law, from Listing 9.09 to the new obesity rules, adversely affected Plaintiff's prospects for success on the merits of her disability claim. The "persuasive and apposite" analysis of *National Mining Association*

invariably leads to the conclusion that the application of the new obesity rules to Plaintiff's disability claim had an impermissible retroactive effect.**3**  Concurring Op., Judge Gilman, at 12.

The D.C. Circuit's analysis comports with the Supreme Court's guidance in *Landgraf*. The Supreme Court called on the lower courts to utilize "familiar considerations of fair notice, reasonable reliance, and settled expectations" in a retroactivity analysis. *Landgraf*, 511 U.S. at 270. When application of new law would adversely affect a party's prospects for success on the merits, as it did in this case, these "familiar considerations" counsel against retroactive application of the new law. This remains true even if the new law is superficially labeled as "procedural."**4**

The lead opinion's repeated reliance on *Altmann*, in deeming that the change in the SSA's obesity rules is procedural, is puzzling. *Altmann* was not a case whose decision hinged upon the Supreme Court's determination that the relevant change in law was procedural; indeed, the Supreme Court specifically rejected that argument:

> Under *Landgraf*, . . . it is appropriate to ask whether the Act affects substantive rights (and thus would be impermissibly retroactive if applied to preenactment conduct) or addresses only matters of procedure (and thus may be applied to all pending cases regardless of when the underlying conduct occurred). *But the FSIA defies such categorization*.

541 U.S. at 694 (emphasis supplied). The Court's decision did not rely on the procedural-substantive line in its analysis. Instead, the basis of the decision was that the FSIA defined the boundaries of sovereign immunity, a principle where the presumption against retroactivity was inapplicable in that *sui generis* context. *Id.* at 696. *Altmann* simply cannot be read to support the notion that the shift in obesity rules was merely procedural.

The lead opinion's misapprehension of *Altmann* is readily apparent when it cites to that case to support the proposition that "a statute that has been held to be substantive in one context is not thereby made substantive for retroactivity purposes." Lead Op. at 7 n.2. There is absolutely no language in *Altmann* that says such a thing. As stated above, *Altmann* explicitly states that the FSIA defied categorization as either substantive or procedural law. 541 U.S. at 694. The pages to which the lead opinion cites continue and state that, even though the FSIA was not clearly substantive or procedural, the general presumption against retroactivity did not apply to sovereign immunity, as sovereign immunity reflected "current political realities and relationships," as opposed to a set of laws on which the foreign countries relied "to shape their conduct." *Id.* at 695-96. The Supreme Court did not hold that the FSIA was "substantive in one context," Lead Op. at 7 n.2, and the

---

**3**Any attempt to distinguish *National Mining Association* from the instant case on the grounds that *National Mining Association* involved potential private party liability, as opposed to government benefits or relief, is unprincipled and must fail. No Supreme Court case has carved out an exception to the general presumption against retroactivity for government benefits or relief. Indeed, in one of its major retroactivity decisions, the Supreme Court found that the deletion of a form of immigration relief had an impermissible retroactive effect on the petitioner's application for said relief. *I.N.S. v. St. Cyr*, 533 U.S. 289, 321-22 (2001). Simply put, the finding of an impermissible retroactive effect is not reserved solely, or even primarily, for cases of private party liability.

**4**The lead opinion cites to *Glen Coal Company v. Director, Office of Workers' Compensation Programs* as an impediment to this Court's consideration and adoption of the analysis in *National Mining Association*. The lead opinion claims that in that case, this Court applied the new BLBA rules to pending cases, a decision that is inconsistent with *National Mining Association*. This argument fails for three reasons. First, while the Court in *Glen Coal Company* found that the new BLBA rules could be applied to pending cases, this statement was dicta, as the plaintiff employee met the requirements under the old BLBA scheme. 77 Fed. App'x 878, 889-90 (6th Cir. 2003) (unpublished decision). Second, *Glen Coal Company* is an unpublished case, so it is not binding on this Court. *See, e.g.*, *Lundgren v. Mitchell*, 440 F.3d 754, 765 n.3 (6th Cir. 2006); 6 Cir. R. 206. Third, even if *Glen Coal Company* were binding authority, the instant case is before the *en banc* Court, which may overrule prior binding authority. 6 Cir. R. 206.

Supreme Court most certainly did not hold that substantive law in one context may not be substantive law in the retroactivity context, so that the application of the FSIA would not have an impermissible retroactive effect on the defendants in that case. There is no support for the lead opinion's assertion that substantive law may, through some form of judicial alchemy, become some other type of law for purposes of retroactivity analysis.

The lead opinion also states that the "relevant activity" here is adjudicatory conduct, so that the deletion of Listing 9.09 and the application of the new rules did not have a retroactive effect:

> Changes to these listings consequently have their effect on benefits applications when claimants reach step three in the process of adjudicating their claims.
>
> A rule regulating the evaluation and presentation of proof does not normally operate retroactively if it is applied to pending cases. The SSA may freely change rules that purely govern the conduct of adjudication, without fear of retroactive effect, if those changes apply only to pending cases.

Lead Op. at 8. As an initial note, this is a none-too-subtle repackaging of the lead opinion's previous argument labeling the deletion of Listing 9.09 and the promulgation of new rules as a procedural change. The phrase "adjudicatory conduct" is simply another way to describe procedure in the litigation process. This is especially apparent in the lead opinion's use of the phrase "evaluation and presentation of proof" and the lead opinion's characterization of Listing 9.09 as a "rule of adjudication"; the lead opinion is reasserting its position that changes in procedure do not give rise to an impermissible retroactive effect. Obviously, a change in the burden of proof or in a presumption addresses the adjudication of a claim; however, this does not necessarily mean that such a change does not have an impermissible retroactive effect. For the reasons set forth in addressing the lead opinion's procedural-substantive analysis, this argument fails. Moreover, taken to its logical endpoint, the lead opinion's inquiry is contrary to Supreme Court precedent. For example, in *Landgraf*, the statute at issue was the Civil Rights Act of 1991, which stated that a plaintiff that brought suit on a discrimination claim could seek compensatory and punitive damages. 511 U.S. at 247. One could quite plausibly describe the statute as addressing adjudicatory conduct, as it describes what types of damages a plaintiff may seek when she brings a claim. According to the lead opinion's logic, the fact that the Civil Rights Act of 1991 addressed adjudicatory conduct would lead to the inescapable conclusion that the statute could be applied to pending cases, a result that is at odds with the decision in *Landgraff*. Likewise, the lead opinion would find no impermissible retroactive effect in applying to pending cases the challenged provisions in *National Mining Association*; those provisions too dealt with adjudicatory conduct in that they changed certain presumptions and burdens of the parties when a Black Lung Benefits claim was raised. The point is simple: labeling an action as "adjudicatory conduct" is as helpful as labeling an action as "procedural," which is to say that it is of no help at all. By resting its decision on these labels, the lead opinion ignores the true retroactive harm that has befallen Plaintiff in the application of the new regulations to her disability application.

## IV.

Because the deletion of Listing 9.09 was a substantive change, our analysis should be concluded; the SSA's application of the new rules to Plaintiff's disability claim had an impermissible retroactive effect. I would therefore remand the case to the SSA to review Plaintiff's application under Listing 9.09.[5] I write further only to address a peculiar argument raised by the

---

[5]While Judge Griffin's partial concurrence correctly concludes that the application of the new rules to Plaintiff's claim had an impermissible retroactive effect, the remedy he proposes, remanding Plaintiff's case to the SSA to determine whether Plaintiff is entitled to disability payments for the window of time beginning with Plaintiff's

lead opinion–that Plaintiff did not rely on Listing 9.09 in becoming disabled, so that the deletion of Listing 9.09 did not work an impermissible retroactive effect.

At the risk of stating the obvious, most if not all of this country's disabled did not rely on SSA rules and regulations or even disability benefits in becoming disabled. Inherent in this point is that a person generally does not choose to become disabled; a disability is ordinarily the product of circumstances beyond the control of the person whom it afflicts. But the absence of reliance on law in becoming disabled is not dispositive in determining whether a change in that law has an impermissible retroactive effect. Under the lead opinion's analysis, the SSA could theoretically withdraw the availability of disability benefits from all pending applicants and still pass muster under *Landgraf*, as none of these applicants relied on SSA rules or regulations or disability benefits in becoming disabled.[6] In fact, under the lead opinion's interpretation of *Landgraf*, the SSA could even withdraw disability benefits from actual recipients who previously qualified for such benefits, as the recipients also did not rely on SSA rules or regulations or disability benefits in becoming disabled, nor could the recipients claim reliance on disability benefits in ceasing work, as such recipients claimed that it was their disabilities that prevented them from working.[7] The lead opinion's logic, that because Plaintiff did not rely on SSA rules or regulations in becoming disabled, the application of new rules does not work an impermissible retroactive effect, strikes with too broad a stroke; such an inelegant approach would find no retroactive harm in even the most blatant of cases.

It is plain that Plaintiff did not rely on SSA rules and regulations in becoming disabled. This fact, however, is irrelevant as to whether the application of the new rules would work an impermissible retroactive effect. The facts in *Landgraf* illustrate this point: one could not say that the defendant employer somehow relied on the Civil Rights Act of 1964 and permitted a hostile work environment so that application of the Civil Rights Act of 1991 would have a retroactive effect. It would be facetious to argue that an employer allows a hostile work environment in reliance on the limited remedies provided by the Civil Rights Act of 1964, just as it would be facetious to argue that a person becomes disabled in reliance on the rules and regulations available to establish a disability claim. Yet the Supreme Court still found an impermissible retroactive effect in *Landgraf*. The question then becomes what exactly was the underlying act in *Landgraf* that the Supreme Court held to be protected from retroactive application of new law.

---

application and ending with the enactment of the new rules, is inconsistent with federal law. The application of the new obesity rules either has an impermissible retroactive effect or it does not; this is indeed an all-or-nothing proposition. Under 42 U.S.C. § 423(f), the SSA may terminate benefits only for certain specific reasons, not one of which is the adoption of new rules or regulations.

Judge Griffin attempts to explain away § 423(f) by stating that the provision applies only to recipients of disability benefits, and Plaintiff is not a current recipient of disability benefits; however, this is placing the cart before the horse, as Judge Griffin would still have the SSA determine whether Plaintiff should be a recipient of disability benefits in the first place. If the SSA determines, under Listing 9.09, that Plaintiff is disabled and should receive benefits, the SSA may not then take away these benefits as of the date on which the new rules were enacted, for this would be contrary to § 423(f). Indeed, in the new rules, the SSA specifically states, "When we conduct a periodic continuing disability review (CDR), we will not find that an individual's disability has ended based on a change in a listing." *Social Security Ruling, SSR 02–01p; Titles II and XVI: Evaluation of Obesity*, 67 Fed. Reg. 57,859 (2002). If the SSA finds that Plaintiff was disabled as of the date of her application, it must give her disability benefits, and it may not terminate those benefits merely because of a rule change on a later date. In order to terminate benefits, the SSA must follow 42 U.S.C. § 423 and the corresponding rules and regulations.

[6]Of course, whether such an action by the SSA would survive under *Chevron* review is an open question that would not affect the retroactivity analysis.

[7]Such an action by the SSA would raise due process and *Chevron* concerns that would not affect the retroactivity analysis.

The Supreme Court found that the underlying act of the employer in *Landgraf* was *its planning* on how to address a hostile work environment claim: "The introduction of a right to compensatory damages is also the type of legal change that would have an impact on private parties' planning." 511 U.S. at 282. Specifically, the Court stated that "[t]he new damages provisions . . . can be expected to give managers an added incentive to ward off discriminatory conduct by subordinates before it occurs." *Id.* at 282 n.35. Under the Civil Rights Act of 1964, the employer was liable only for equitable remedies; as a result, it planned accordingly by allocating expenditures, effort, and policies commensurate with the possible liability. Under the Civil Rights Act of 1991, the employer was subject to a much broader range of remedies, so that it would have planned a much greater allocation of resources to remedy the problem of a hostile work environment. Thus, the Supreme Court found that application of the Civil Rights Act of 1991 to the employer would have had a retroactive effect, as the employer had planned its discrimination policies based on the Civil Rights Act of 1964.

Plaintiff's case presents a similar issue of planning based on the SSA's eligibility requirements for disability benefits. The difficulty of proving eligibility for benefits is certainly a factor considered by an individual in disability planning. For example, suppose that qualifying for Social Security disability benefits is extremely difficult; only 1% of applicants eventually receive benefits, and this is only after a torturous eligibility review process. An individual might look at the difficulty in proving eligibility and plan accordingly, by purchasing a third party disability insurance policy with less exacting requirements, by increasing her level of savings in case of disability in the future, and other such measures. Likewise, if qualifying for Social Security disability benefits were extremely easy, an individual might have a very different portfolio mix in her planning, as she would not invest heavily in instruments that hedge the risk of disability. Thus, in this case, Plaintiff did not become disabled in reliance on the disability benefits scheme available at the time; but rather, she planned for the possibility of becoming disabled in reliance on the disability benefits scheme available at the time. Had Plaintiff known that the SSA's requirements for eligibility would have changed so dramatically, she might have been inclined to alter her planning. This is especially true with respect to Plaintiff's situation, where her application for disability benefits was pending for a number of years. This is the reason why application of the new obesity rules would have a retroactive effect on Plaintiff's planning under Listing 9.09.

The lead opinion appears to believe that a reliance theory based on disability planning "proves too much," as such a theory would "for many, many years" preclude application of newly enacted legislation to those who planned in accordance with the old scheme. Lead Op. at 6 n.1. This is incorrect and contrary to Supreme Court precedent. A simple example will illustrate this point: the Supreme Court did not hold in *Landgraf* that because the defendant employer, before 1991, relied on the Civil Rights Act of 1964 in planning how to address a hostile work environment, an employee could never raise (or, for many, many years could not raise) a claim under the Civil Rights Act of 1991, even for claims based on events after 1991. Instead, the Supreme Court held that a court could not apply the Civil Rights Act of 1991 to the defendant employer for activity that took place before 1991 because it did not have the opportunity to plan according to that Act with specific respect to such activity. *Landgraf*, 511 U.S. at 282-83. In other words, reliance on the old scheme in a party's planning is not sufficient to demonstrate that the application of the new scheme would have an impermissible retroactive effect. Instead, a party's reliance on the old scheme in its planning, *coupled* with the party's inability to change its planning in accordance with the new scheme, would demonstrate an impermissible retroactive effect if the new scheme were applied to that party. In this case, it is undisputed that Plaintiff was unable to change her disability planning to accommodate the deletion of Listing 9.09 and implementation of the new obesity rules, which occurred in 1999, because she became disabled in 1996. In contrast, suppose Plaintiff became disabled in 2004. In that case, even though Plaintiff, before 1999, had planned based on the old regime, she also had the ability to change her planning to accommodate the rules of the new regime,

so that the application of the new obesity rules would not have a retroactive effect. Such is not the case here.

The effect on Plaintiff's disability planning also illustrates why the deletion of Listing 9.09 and the implementation of a new regulation was a substantive, as opposed to a procedural, change. A procedural change usually does not work an impermissible retroactive effect because a party usually does not rely on rules of procedure: "We [have] noted the diminished reliance interests in the matter of procedure. . . . Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive." *Landgraf*, 511 U.S. at 275 (citations omitted). In short, procedural rules may generally be retroactively applied, because "even if a party had known of a procedural change in advance, it would not have changed its conduct prior to the lawsuit." *United States v. Real Property in Section 9, Town 29 North, Range 1 West Township of Charlton*, 241 F.3d 796, 799 (6th Cir. 2001) (citing *Landgraf*, 511 U.S. at 275). Because a change from one procedure to another generally has an ambiguous and unknown effect on a party, a party usually does not fashion its conduct according to procedural rules. Here, however, had Plaintiff known of the change to the obesity rules in advance, she definitely would have changed her conduct in that her disability planning would have been significantly different.[8]

*National Mining Association* is a textbook example of how a change in rules and regulations in establishing a claim may have an impermissible retroactive effect on a party's planning based on the old regime. In that case, the employer-coal mine operators purchased insurance to cover their liabilities for claims under the BLBA. 292 F.3d at 855. The insurance companies charged a premium that corresponded to the difficulty in establishing a BLBA claim under the rules and regulations at that time. The DHHS subsequently promulgated numerous rules that made it easier for a coal miner to establish a BLBA claim. *Id.* The net effect of these rules was that the insurance companies needed to set higher premiums in order to offset the increase in potential liability. *Id.* The court found that where the new rules affected substantive liability determinations, the rules operated retroactively on pending claims. *Id.* at 859 (citing *Martin*, 527 U.S. at 359).

Inherent in *National Mining Association* is the notion that the employer-coal mine operators and the insurance companies relied on the then-existing rules and regulations in planning how to address BLBA liability. When the DHHS promulgated new rules that made it easier to establish a BLBA claim, the DHHS disrupted this planning such that application of the new rules to pending claims would have had an impermissible retroactive effect by exposing the coal mine operators to a greater amount of liability, thus subjecting the insurance companies to greater losses than that reflected in the premiums the insurance companies charged under the old regime. Likewise, Plaintiff relied on the then-existing rules and regulations, including Listing 9.09, in her disability planning; the SSA's application of the new obesity rules would also disrupt this planning so that application to her pending claim would have an impermissible retroactive effect. It goes without saying that Plaintiff's reliance on the SSA's old regime of rules and regulations is somewhat more subtle and less perceptible than the crystalline form of payment of insurance premiums. This fact, however, does not render Plaintiff's reliance any less real or palpable. The individual consumer is faced with a myriad of decisions to act or to refrain from acting, decisions that are shaped by changes such as the deletion of Listing 9.09 and the implementation of new obesity rules. Just as the coal mine operators and insurance companies would have acted differently in their liability planning under the new BLBA rules and regulations as opposed to the prior system, so too would Plaintiff have acted

---

[8]While it is true that the possibility of a shift to a more demanding disability regime "would not have dissuaded" Plaintiff from filing a claim for disability, Concurring Op., Judge Gilman, at 14, this is somewhat beside the point. Plaintiff's disability planning comprises more than her decision to file a claim for disability. Her planning encompasses all of her financial planning to offset the risk of disability, which would be affected by a more demanding disability regime. *See supra*.

differently in her disability planning had she known about the change from Listing 9.09 to the new obesity rules.[9]  Disruption of Plaintiff's planning implicates Plaintiff's "fair notice, reasonable reliance, and settled expectations" with respect to this planning.  *Landgraf*, 511 U.S. at 270.

V.

Because the deletion of Listing 9.09 and the application of the new obesity rules had an impermissible retroactive effect on Plaintiff's pending disability application, I would reverse the order of the district court and remand Plaintiff's case to the SSA so that her application for disability benefits could be considered under Listing 9.09.

---

[9]The instant case is thus distinguishable from the facts in *Patel v. Gonzales*, 432 F.3d 685 (6th Cir. 2005), as there is no indication in that case that the petitioners would have changed their action of illegally entering the United States had they known of the change in eligibility for  discretionary relief under § 212(i) of the Immigration and Nationality Act.